ALLEN BARRETT ET AL. *v.* DANBURY HOSPITAL ET AL.
(14935)

CALLAHAN, BORDEN, BERDON, KATZ and PALMER, Js.

Argued November 2, 1994—decision released February 21, 1995

*Steven R. Smart,* with whom was *Sally J. Katz,* for the appellants (plaintiffs).

*John F. Costa,* for the appellees (defendants).

BORDEN, J. The principal issue in this appeal is whether, under the circumstances of this case, the fear of the named plaintiff, Allen Barrett, of contracting or transmitting acquired immune deficiency syndrome (AIDS) or another blood-borne disease, was a compensable injury giving rise to a cause of action sounding in negligence or medical malpractice. The plaintiffs, Allen Barrett (Barrett) and his wife, Mary Barrett, brought this action in six counts against the defendants, Danbury Hospital (hospital) and Victor Estaba, a physician, alleging three theories of recovery against each defendant: (1) negligence; (2) the doctrine of res ipsa loquitur; and (3) loss of consortium. The defendants moved for summary judgment on all counts. The trial court granted the motion on the basis that the plaintiffs had failed to establish a compensable claim for "AIDS phobia," and rendered judgment for the defendants accordingly.

The plaintiffs appeal[1] from the summary judgment, claiming that the trial court improperly: (1) required the plaintiffs to establish that Barrett actually had been exposed to AIDS or another blood-borne disease; and (2) denied the plaintiffs' request for leave to amend their complaint. We affirm the judgment of the trial court.

The trial court granted summary judgment based on the following undisputed facts. On June 13, 1990, Barrett came to the hospital complaining of abdominal pain. He was placed on a stretcher in the emergency room for an examination. As a result of the examination, Estaba diagnosed Barrett's complaint as a gallstone condition and administered an injection to alleviate the pain. During the course of his examination of Barrett, Estaba became aware that Barrett was sitting in blood.

---

[1] The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

In an effort to locate the source of the blood, Estaba performed a rectal examination of Barrett. Estaba was unable to locate the source of the blood, however, and subsequently performed a second rectal examination. Visual inspection and microscopic testing performed as part of these rectal examinations indicated that no blood was present in Barrett's rectum. In fact, the blood came through two slits in the vinyl pad that covered the stretcher upon which Barrett was sitting.

The plaintiffs alleged in their complaint that, as a result of Barrett's contact with the blood from the stretcher and its alleged introduction into his rectum, he has suffered and will continue to suffer from anxiety and fear that he may contract HIV,[2] hepatitis or another blood-borne, life-threatening disease.[3] They further alleged that Barrett is fearful of transmitting such a disease to his wife, and that he has thereby been deprived of his wife's consortium. Additionally, Mary Barrett alleged deprivation of her husband's consortium.

The defendants' motion for summary judgment was supported by the affidavits of Estaba, Sara Tomanio, Frank A. Bia, and Mary Ellen Ginnetti. Estaba stated the following in his affidavit. Barrett entered the emergency room complaining of pain and provided a history

[2] The plaintiffs refer in their complaint and their briefs to the "AIDS virus." The retrovirus that causes AIDS is properly called the human immunodeficiency virus (HIV).

[3] The plaintiffs conceded in oral argument in this court that their claims are limited to the period prior to which it became medically certain that Barrett had not been infected by HIV. The plaintiffs also acknowledged that there was no evidence that the other diseases feared by the plaintiffs have a longer window for manifesting infection than does HIV. Barrett tested negative for HIV more than one year after the incident giving rise to the plaintiffs' complaint. The trial court determined in the summary judgment proceedings that, to a 95 percent degree of certainty, a person would test positive for HIV, if at all, within six months after exposure to the virus, and the plaintiffs do not challenge that determination. For purposes of this appeal, therefore, we consider that determination to be undisputed.

of previous gall bladder trouble. During the course of Estaba's examination of Barrett, Estaba observed blood on the stretcher and decided to perform a rectal examination to determine if the blood was emanating from Barrett's rectum. The stool yielded by the examination did not appear bloody, and a test of the stool for blood was negative. Estaba repeated the examination and test to double check the results, and again the test was negative. The test specifically was performed in a manner so as to prevent any contact or transmission of blood. The fact that the stool tested negative for blood indicated that the examinations had not transmitted any blood from the stretcher to Barrett's rectum.

Tomanio's affidavit stated the following. She was Barrett's treating nurse in the emergency room. Estaba performed a rectal examination of Barrett and ordered laboratory studies and tests. Estaba subsequently noticed blood on the stretcher sheet and performed another rectal examination. Each of these examinations was negative for the presence of blood. The spots of blood on the sheet were "about the size of a half-dollar and a somewhat more oblong shape of approximately of one to two inches at its greatest measurement," and only the patient's underwear and the sheet beneath his buttocks were streaked with bright red secretions.

Bia stated the following in his affidavit. He is a physician who is board certified in internal medicine and the subspecialty of infectious diseases. He is currently an "associate professor of medicine (infectious diseases) and laboratory medicine" at Yale University School of Medicine, and the attending physician at the Yale AIDS Care Program. Bia reviewed the emergency room medical record regarding Barrett, the affidavits of Estaba, Ginnetti and Tomanio, and the plaintiffs' amended complaint. On the basis of this review, he is convinced that

"[g]ood practice dictated that an investigation be made via rectal examination to evaluate whether the patient's GI tract was the source of the blood." Bia further stated that "[t]he guaiac negative stool specimens clearly demonstrate that no blood was introduced into the patient's rectum. The guaiac evaluation is very sensitive to extremely small amounts of blood and would have been positive if blood had been emanating from the patient's rectum, or alternatively, blood had been introduced into the plaintiff's rectum, via the actions of Dr. Estaba." The contact of blood with the patient's undergarments or hospital gown is insufficient to transmit HIV to a patient. He concluded that "[t]he chances of Mr. Barrett contracting HIV or AIDS from such an incident as described can be assessed as nil."

The affidavit of Ginnetti discloses the following. She was the risk manager of the hospital. Her review of all emergency room records for the twenty-nine hours prior to Barrett's examination revealed that none of the cases during that period detailed a medical history of AIDS, an infection with HIV or AIDS-related syndrome.

The plaintiffs' opposition to the motion was supported by Barrett's hospital record and by the affidavits of Barrett and Ann Dion, the director of the emergency room at Lawrence and Memorial Hospital in New London. The hospital record details Barrett's medical complaint and the actions taken by Estaba and other hospital personnel, including the rectal examinations and their negative results for blood. At the bottom of the record is the following handwritten note. "Note: Blood was found to be leaking through broken vinyl area on stretcher mattress cushion. The [patient] and his wife noticed this since it permeated to [the] sheet he was laying on!"

Dion's affidavit disclosed the following. She is a registered nurse licensed in the state of Connecticut. She

has been an emergency room nurse for eighteen years, is currently the nursing director of ambulatory services at Lawrence and Memorial Hospital and serves as president of the Connecticut Emergency Nurses Association. After reviewing the medical record, the affidavits of Estaba, Tomanio, Ginnetti, Bia and the amended complaint, she concluded that the hospital fell below the standard of care in Connecticut for maintaining equipment by causing the stretcher to be in a defective and dangerous condition. She also concluded that, in her professional opinion, "having dealt with hundreds of patients over the years . . . a patient sitting in a pool of foreign blood could reasonably fear that he might contract the AIDS virus, hepatitis or other blood product transmitted life threatening disease." It is also Dion's opinion that the documentation of the examination of Barrett fell below the required standard of care because it failed to include the times the rectal exams were done and did not contain a description of the patient's buttocks, particularly whether it was examined for fissures or scratches. Dion also offered her opinion that the blood on the stretcher could have been there for longer than the period researched by Ginnetti.

Barrett claimed the following in his affidavit. During the course of Estaba's examination, Estaba rolled him over to give him an injection for his pain and discovered that his "backside was covered with blood." Estaba performed a rectal examination, but failed to find the cause or source of the blood. Barrett was given a "johnny coat" and clean sheets were put on the stretcher. He was returned to the stretcher, and felt moisture on his buttocks. He noticed "a large bloody area" on his johnny coat and on the sheet covering the stretcher at the location of his buttocks. Estaba performed another rectal examination, but did not find the cause or source of the blood. At some point during the

course of the examination, he was given an injection in his buttocks. After getting dressed, Barrett realized that the blood was not his own. He removed the sheet from the stretcher and saw blood oozing from the stretcher. "The blood was the blood of a prior patient or patients." The affidavit concludes with the following: "When I saw the blood and realized that it had covered my backside and that Dr. Estaba had performed two rectal examinations and introduced the blood into my rectum, I became shocked and distraught and fearful that I might contract the AIDS virus, hepatitis or another blood product transmitted life threatening disease and that I might infect my wife, Mary Barrett."

The plaintiffs also filed a request to amend their complaint in several respects, which the trial court denied. The trial court concluded that the plaintiffs' "fear is unreasonable in view of the facts and evidence presented to this court," because the plaintiffs failed to demonstrate that Barrett actually had been exposed to any disease causing agent. The court therefore granted the summary judgment for the defendants. This appeal followed.

I

The plaintiffs claim that the trial court improperly determined that judgment for the defendants was required as a matter of law. The plaintiffs' primary argument is that the trial court improperly required the plaintiffs to show "actual exposure" to a disease causing agent in order to recover for a fear of contracting AIDS or another disease. The plaintiffs also claim that, even if the court properly adopted the actual exposure test, the trial court improperly concluded that Barrett had not suffered an actual exposure to HIV because, they assert, he suffered a "significant exposure" as defined in General Statutes § 19a-581

(14). The plaintiffs also assert that the trial court should not have granted the motion for summary judgment because there were genuine issues of material fact disclosed by the documentation submitted in support of, and in opposition to, summary judgment. The plaintiffs further assert that the trial court improperly excluded the affidavits of experts from its consideration of the motion for summary judgment.

"The standard of review of a trial court's decision to grant a motion for summary judgment is well established. Practice Book § 384 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. *Suarez* v. *Dickmont Plastics Corp.*, 229 Conn. 99, 106, 639 A.2d 507 (1994)." (Internal quotation marks omitted.) *Water & Way Properties* v. *Colt's Mfg. Co.*, 230 Conn. 660, 664–65, 626 A.2d 143 (1994). We conclude that, applying this standard, there were no genuine issues of material fact and that the defendants were entitled to judgment as a matter of law.

A

We first consider the plaintiffs' claim that the trial court improperly refused to consider the affidavits of the experts that were presented to it by the parties in connection with the defendants' motion for summary judgment.[4] We agree with the plaintiffs' claim, as

---

[4] Although the trial court determined that it was precluded from relying on the expert affidavits offered by both the plaintiffs and the defendants, the trial court's memorandum does rely on Estaba's affidavit regarding the nonintroduction of blood into Barrett's rectum. Estaba's affidavit contained both assertions of a factual nature and assertions in the nature of expert testimony. Any inequity, however, that resulted from the trial court's

indeed do the defendants. That, however, does not mandate that we reverse the trial court's judgment because, in deciding this appeal, we have taken those affidavits into account.

The trial court determined that it was precluded by Practice Book § 381 from taking into account the affidavits of experts on a motion for summary judgment. Section 381 provides: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto."

Thus, § 381 sets forth three requirements necessary to permit the consideration of material contained in affidavits submitted in a summary judgment proceeding. The material must: (1) be based on "personal knowledge"; (2) constitute facts that would be admissible at trial; and (3) affirmatively show that the affiant is competent to testify to the matters stated in the affidavit. The requirements that the affidavit be based on "personal knowledge" and contain "facts" admissible at trial do not mean, however, that expert opinions in the form of affidavits may not be considered in a summary judgment proceeding. For the purposes of an expert's opinion, the expert's "personal knowledge" of "facts" is comprised of those materials on the basis of which he properly may render his opinion. See *State* v. *Kemp*, 199 Conn. 473, 476, 507 A.2d 1387 (1986). These materials include those on the basis of which the expert forms an opinion, and include such hearsay as medical

use of this expert testimony while it refused to consider the expert affidavits offered by the plaintiffs is remedied by our conclusion that all the expert affidavits should have been considered, and by our consideration of these affidavits in reaching our conclusion that the trial court properly granted summary judgment in favor of the defendants.

records. See *State* v. *Cosgrove*, 181 Conn. 562, 584, 436 A.2d 33 (1980). Furthermore, an expert's opinion is, for purposes of § 381, a "fact" that would be admissible at trial, assuming that the expert is qualified to render such an opinion.

Indeed, it is unlikely that a trial court could render a decision on a motion for summary judgment in a medical malpractice case in the absence of expert affidavits. "Except in the unusual case where the want of care or skill is so gross that it presents an almost conclusive inference of want of care; *Puro* v. *Henry*, 188 Conn. 301, 305, 449 A.2d 176 (1982); the testimony of an expert witness is necessary to establish both the standard of proper professional skill or care on the part of a physician; *Shelnitz* v. *Greenberg*, 200 Conn. 58, 66, 509 A.2d 1023 (1986); and that the defendant failed to conform to that standard of care. *Mather* v. *Griffin Hospital*, 207 Conn. 125, 131, 540 A.2d 666 (1988); *Snyder* v. *Pantaleo*, [143 Conn. 290, 295, 122 A.2d 21 (1956)]." (Internal quotation marks omitted.) *Campbell* v. *Palmer*, 20 Conn. App. 544, 548, 568 A.2d 1064 (1990).

B

We next consider the plaintiffs' assertion that there were genuine issues of material fact that precluded the trial court's granting of the motion for summary judgment. The plaintiffs claim that the trial court disregarded or ignored issues of material fact as to: (1) the applicable standard of care and the defendants' alleged breach thereof; and (2) whether blood was introduced into Barrett's rectum. We are not persuaded that there was a genuine issue as to either of these facts.

The plaintiffs' contention that there was a disputed issue as to the applicable standard of care and whether such standard was breached fails to recognize that the trial court did not grant the motion for summary judg-

ment on the basis of a finding that there was no negligence on the part of the defendants. The trial court determined that, regardless of any breach of the standard of care by the defendants, a compensable injury did not result. The trial court's determination did not address the issue of the proper standard. Instead, the trial court in effect concluded that, even if the applicable standard had been violated, the plaintiffs' alleged injuries were not compensable as a matter of law. In light of this determination, the issues of the applicable standard of care and whether it was breached were immaterial to the outcome of the case and the trial court, therefore, was not required to address them.[5]

The plaintiffs also dispute the trial court's determination that they had failed to submit any evidence to support their allegation that blood had been introduced into Barrett's rectum. The plaintiffs argue that Barrett's affidavit constitutes evidence that contradicts the affidavit of Estaba, which stated that no blood was introduced into Barrett's rectum. We disagree with the plaintiffs' assertion.

Barrett stated the following in his affidavit: "I felt moisture on my backside. . . . When I saw the blood and realized that it had covered my backside and that *Dr. Estaba had performed two rectal examinations and introduced the blood into my rectum,* I became shocked and distraught and fearful that I might contract the AIDS virus, hepatitis or other blood product transmit-

---

[5] Indeed, in oral argument in this court, the plaintiffs apparently agreed with this conclusion: "There is no dispute, at this point in the proceedings, that there was a duty owed to [Barrett] and that that duty was breached. The only issue before the court is whether there is a legally compensable injury as a result of that breach." Although the defendants stated at oral argument that they did not concede that there was a breach of any duty owed to Barrett, the plaintiffs are correct in their assertion that, for purposes of this summary judgment, the only issue before us is whether there was a legally compensable injury.

ted life threatening disease and that I might infect my wife, Mary Barrett." (Emphasis added.)

It is clear, therefore, that the plaintiffs' factual assertion that there was blood in Barrett's rectum was based solely, not on a belief that any blood could have entered his rectum while he sat on the stretcher, but on the belief that Estaba had introduced blood into his rectum when Estaba performed the two rectal examinations. There is no assertion in Barrett's affidavit, or in the plaintiffs' complaint, that blood was introduced into Barrett's body through any method other than by the two rectal examinations. To the contrary, the plaintiffs allege only that during the first rectal examination, "the blood was introduced into [Barrett's] rectum," and that during the second rectal examination, "the blood was again introduced into [Barrett's] rectum." Although the plaintiffs also allege that Barrett's buttocks were covered with blood, there was no allegation that such exposure caused his fear, nor was there any evidence offered by the plaintiffs' affidavits to suggest that such exposure reasonably could lead to infection with HIV or any other blood-borne disease.

The plaintiffs offered no evidence, however, beyond Barrett's assertion, to contradict Estaba's statement in his affidavit that the rectal examinations were "specifically performed in a manner to prevent any contact or transmission of blood on the stretcher surface to the patient's rectum. The fact that the report was negative for any blood in the stool is also indicative of successful examination without the transmission of any blood from the stretcher to the patient's rectum." Furthermore, Bia, the defendants' expert on infectious diseases, stated in his affidavit that "[t]he guaiac negative stool specimens clearly demonstrate that no blood was introduced into [Barrett's] rectum. The guaiac evaluation is very sensitive to extremely small amounts of blood and would have been positive if blood had been

emanating from the patient's rectum, or alternatively, blood had been introduced into [Barrett's] rectum, via the actions of Dr. Estaba." The plaintiffs' unsupported assertion that Estaba had introduced blood into Barrett's rectum was insufficient to counter Estaba's and Bia's expert testimony that the results of the guaiac tests, which showed no blood in the stool, conclusively determined that blood had not been introduced into Barrett's rectum.

"Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact; *D.H.R. Construction Co.* v. *Donnelly*, 180 Conn. 430, 434, 429 A.2d 908 (1980); a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue. . . . *Scinto* v. *Stamm*, 224 Conn. 524, 530, 620 A.2d 99, cert. denied,     U.S.    , 114 S. Ct. 176, 126 L. Ed. 2d 136 (1993). It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court [in support of a motion for summary judgment]. . . . *Burns* v. *Hartford Hospital*, 192 Conn. 451, 455, 472 A.2d 1257 (1984)." (Internal quotation marks omitted.) *Water & Way Properties* v. *Colt's Mfg. Co.*, supra, 230 Conn. 664–65. The plaintiffs' assertion, in and of itself, that Estaba had introduced blood into Barrett's rectum, therefore, was insufficient to establish an issue of material fact in this case.

Furthermore, the affidavit of Dion, an emergency room nurse at Lawrence and Memorial Hospital, was insufficient to create an issue of material fact. Dion stated in her affidavit that, after reviewing the Danbury Hospital records, "[i]t is also my professional opin-

ion, having dealt with hundreds of patients over the years, that a patient sitting in a pool of foreign blood could reasonably fear that he might contract the AIDS virus, hepatitis or other blood product transmitted life threatening disease.''

Given that it was the plaintiffs' theory that Barrett's fear arose from Estaba's purported introduction of blood into his rectum, and not from the fact that the blood had been in contact with the skin of his buttocks, the only possible relevance of Dion's statement is that Barrett's fear was reasonable. Whether an individual's fear is reasonable or unreasonable, however, is not an opinion that generally would fall within the purview of nursing expertise.[6] It is rather an ultimate factual determination that juries are capable of reaching based on their own experience, without the aid of medical expertise. See *Suarez* v. *Dickmont Plastics Corp.*, supra, 229 Conn. 120–21 (*Borden, J.*, dissenting and concurring). Thus, without more of a showing of expertise, Dion's opinion that Barrett's fear was reasonable would not have been admissible at trial and was, therefore, not properly cognizable in summary judgment pro-

---

[6] This conclusion is consistent with our precedent that allows for expert testimony to bear on whether a plaintiff's fear is rational. In *Petriello* v. *Kalman*, 215 Conn. 377, 390, 576 A.2d 474 (1990), we concluded that expert testimony as to the plaintiff's increased risk of suffering a future bowel obstruction was admissible to support her claim for emotional distress. We continue to believe that an expert's estimate as to the probability that a medical condition will occur in the future bears directly on whether a plaintiff's fear of suffering from that condition is reasonable. In contrast, Dion did not state an opinion as to the probability of Barrett's contracting HIV or another blood product transmitted disease, and, indeed, unless qualified as an expert on such matters, she could not have so stated. Dion's statement in her affidavit, unlike the testimony of the physicians in *Petriello,* did not offer a scientific basis upon which the jury could have concluded that Barrett's fear was reasonable. The sum of Dion's statement was that Barrett's fear *was* reasonable. Thus, she rendered an opinion on an ultimate factual issue that, in a trial, would have been for the jury to determine, and that she, as a nurse, had no more expertise to determine than the jurors would have had.

ceedings under Practice Book § 381. Furthermore, although Dion's expert opinion as to the applicable standard of care in an emergency room was within her field of expertise, there was no showing that she was an expert in infectious diseases and that she was, therefore, competent to testify as to the probability of infection with HIV or other blood-borne diseases. To the extent that the plaintiffs rely on her affidavit to establish that AIDS could have been transmitted by the contact of the blood with Barrett's buttocks, therefore, any implied opinion offered to that effect founders on the requirement of § 381 that the "affiant is competent to testify to the matters stated" in her affidavit.

## C

The plaintiffs further argue that, regardless of whether blood was introduced into his rectum, Barrett suffered a "significant exposure" to HIV, as "significant exposure" is defined by General Statutes § 19a-581 (14)[7] and the regulations promulgated thereunder.[8] We disagree.

---

[7] General Statutes § 19a-581 (14) provides: " 'Significant exposure' means a parenteral exposure such as a needlestick or cut, or mucous membrane exposure such as a splash to the eye or mouth, to blood or a cutaneous exposure involving large amounts of blood or prolonged contact with blood, especially when the exposed skin is chapped, abraded, or afflicted with dermatitis. The department [of health services] may further define significant exposure in regulations adopted pursuant to section 19a-589."

[8] Section 19a-589-1 (o) of the Regulations of Connecticut State Agencies provides: " 'Significant exposure,' means an exposure as defined in Section 19a-581 (14) of the general statutes and:

"(1) contact between the mucous membranes (e.g. mouth or eyes) and at least one of the following: blood, a body fluid containing visible amounts of blood, cerebrospinal fluid, synovial fluid, pleural fluid, peritoneal fluid, pericardial fluid, amniotic fluid;

"(2) contact through the skin (such as contact through an open wound or cut or by means of a needlestick or puncture wound injury) with at least one of the following: blood, a body fluid containing visible amounts of blood, cerebrospinal fluid, synovial fluid, pleural fluid, peritoneal fluid, pericardial fluid, amniotic fluid;

"(3) contact of skin, especially when the exposed skin is chapped, abraded or afflicted with dermatitis or the contact is prolonged or involving an exten-

Section 19a-581 (14) is located in chapter 368x of the General Statutes, which is entitled "AIDS Testing and Medical Information." General Statutes § 19a-582, the operative provision of the chapter, sets out a requirement for informed consent prior to the performance of an HIV-related test, subject to certain exceptions. Two such exceptions allow for the performance of an HIV-related test in the absence of consent: (1) "[i]n cases where a health care provider or other person . . . in the course of his occupational duties has had a significant exposure," providing certain criteria are met; General Statutes § 19a-582 (e) (5);[9] and (2) where the behavior of an inmate in facilities operated by the department of correction has resulted in a significant exposure of another inmate. General Statutes § 19a-582 (e) (7). The term "significant exposure" is used in the General Statutes only with regard to these provisions and certain notification provisions associated therewith.

The plaintiffs' argument attempts to import into tort law a definition of a "significant exposure" formulated by the legislature to address a concern inapposite to the considerations at issue in this case. There is no indication in the legislation that a "significant exposure," as defined and used in chapter 368x, was designed to create tort liability between a hospital and a patient. In sum, we agree with the trial court's determination that "[u]pon examination of both the legislative history and the plain language of the statute . . . the term

sive area, with at least one of the following: blood, a body fluid containing visible amounts of blood, cerebrospinal fluid, synovial fluid, pleural fluid, peritoneal fluid, pericardial fluid, amniotic fluid;

"(4) sexual assault (involving anal, vaginal or oral intercourse) on a worker in the course of his or her occupational duties . . . ."

[9] Section 19a-582 (e) (5) was amended by No. 93-291 of the 1993 Public Acts specifically to indicate that volunteer emergency medical services, fire and public safety personnel fall within the provision's definition of "other person." This change has no effect on our analysis in this case.

'significant exposure' is employed only in determining when an HIV-related test can be ordered without first receiving written or oral informed consent within the context of a regulatory or policy making statute. This legislation is not instructive in determining whether a fear of contracting AIDS constitutes a compensable injury."[10]

## D

With this factual background in mind, we turn to the plaintiffs' primary contention, namely, that the trial court used an improper test in determining whether they had alleged a compensable injury. Specifically, the plaintiffs claim that the trial court should not have used the "actual exposure" test, which requires that a plaintiff show actual exposure to a disease causing agent as a prerequisite for prevailing on a claim based on fear of contracting a disease. See, e.g., *Carroll* v. *Sisters of Saint Francis Health Services*, 868 S.W.2d 585 (Tenn. 1993). Rather, they argue, the court should have used the test we established for recovery for unintentional infliction of emotional distress in *Montinieri* v. *Southern New England Telephone Co.*, 175 Conn. 337, 398 A.2d 1180 (1978).[11]

---

[10] Because this case involves an attempt to apply § 19a-581 (14) to a situation involving a dispute between a hospital and a patient, we need not decide whether the section would illuminate the contours of a tort claim asserted between the specific parties covered by chapter 368x.

[11] The dissent attempts to recast the plaintiffs' claim as a claim for medical malpractice, "in which the plaintiffs seek *as an element* of damages compensation for emotional distress." (Emphasis added.) The plaintiffs' claim for compensation for their fear of HIV was the *only* claim for compensation made in this case. The plaintiffs made no claim in the trial court, or before us, that their claim was for physical damages or emotional distress in concert with physical damages. On that basis, the plaintiffs themselves urged that we apply the *Montinieri* test.

Indeed, the dissent apparently harkens back to the days before *Montinieri*, when we precluded recovery for claims sounding solely in emotional distress, without a physical component. We decline to abandon our recognition of such claims, under the circumstances enumerated in *Montinieri*,

In *Montinieri*, we concluded that a plaintiff may recover for emotional distress if "the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm." Id., 345. Because we conclude that, applying the *Montinieri* standard, the defendants were nonetheless entitled to summary judgment, we need not reach the issue of whether the *Montinieri* standard, the actual exposure test, or some other formulation; see, e.g., *Faya* v. *Almaraz*, 329 Md. 435, 620 A.2d 327 (1993) (fear must be reasonable, but actual exposure not required); is the proper test for a case such as this.

In *Montinieri*, the plaintiffs, who had an unlisted telephone number, brought an action against the defendant telephone company for negligence in releasing the plaintiffs' address to an individual who used that information to locate the plaintiffs and hold them hostage. Although the plaintiffs incurred no physical injuries as a result of their ordeal, they were held for more than one hour, during which they were in constant fear for their personal safety and suffered extreme terror. In its charge to the jury, the trial court stated that "a defendant is not liable for emotional distress unless the defendant, or its agents or servants, should have real-

in favor of returning to the technical formality of requiring physical harm. Professors Prosser and Keeton characterize this "magic formula," in the passage quoted by the dissent, as resulting in cases that reduce the requirement of establishing physical harm "to something of an absurdity." W. Prosser & W. Keeton, Torts (5th Ed. 1984) p. 364. We consider the foreseeability test of *Montinieri* to be a more suitable judicial tool than a talismanic adherence to the physical impact requirement.

Despite the dissent's suggestion to the contrary, ordinarily we decide the case before us on the basis on which it was tried, briefed and argued; *Centerbrook, Architects & Planners* v. *Laurel Nursing Services, Inc.*, 224 Conn. 580, 590 n.5, 620 A.2d 127 (1993); rather than on a basis on which the plaintiffs did not rely and to which the defendants had no opportunity to respond. We see no reason in this case to depart from that sound jurisprudential principle.

ized that its conduct involved an unreasonable risk of causing the distress, and from the facts known to it, or its agents, should have realized that the distress, if it were caused, might result in illness or bodily harm." (Internal quotation marks omitted.) *Montinieri* v. *Southern New England Telephone Co.*, supra, 175 Conn. 341. The jury returned a verdict for the defendant, and the plaintiffs appealed, claiming that the trial court should have charged that the plaintiffs were entitled to recover for their emotional distress if they were within the "zone of danger" created by the defendant's conduct. We affirmed the judgment of the trial court and expressed support for the charge given. Id., 345–46.

Applying the *Montinieri* test to the pleadings, affidavits and other evidence before the trial court when it rendered summary judgment for the defendants, we conclude that the plaintiffs would not prevail even under that test. The plaintiffs have offered no evidence whatsoever, beyond mere assertion, to suggest that Barrett was placed in any risk as a result of the alleged negligence of the hospital. We cannot conclude, therefore, that the emotional distress experienced by the plaintiffs arose out of circumstances such that " 'the defendant[s], or [their] agents or servants, should have realized that [their] conduct involved an unreasonable risk of causing the distress . . . .' " *Montinieri* v. *Southern New England Telephone Co.*, supra, 175 Conn. 341. This part of the *Montinieri* test essentially requires that the fear or distress experienced by the plaintiffs be reasonable in light of the conduct of the defendants. If such a fear were reasonable in light of the defendants' conduct, the defendants should have realized that their conduct created an unreasonable risk of causing distress, and they, therefore, properly would be held liable. Conversely, if the fear were unreasonable in light of the defendants' conduct, the defendants would not

have recognized that their conduct could cause this distress and, therefore, they would not be liable. Although we do not adopt the "actual exposure" test in this case, and thereby require the plaintiffs to prove actual exposure to a disease causing agent in order to maintain their cause of action, we are convinced that the plaintiffs have not established a case for emotional distress under the *Montinieri* test because they have failed to show any contact with the blood in the manner that they claimed to have caused their fear.[12] In light of the plaintiffs' failure to meet the uncontroverted evidence that the blood was not introduced into Barrett's rectum, we are convinced that the plaintiffs' fear was not reasonable as a matter of law and, therefore, summary judgment in favor of the defendants was appropriate.

## II

The plaintiffs also claim that the trial court improperly denied their request to amend their complaint. First, the plaintiffs claim that paragraph fourteen of the first count of the proposed amended complaint, dated June 23, 1993, merely amplifies what already had been alleged in the original complaint. Second, they claim that the third and fourth counts of the proposed amended complaint arise from the same group of facts

[12] The plaintiffs have not claimed that they were unaware of the results of the tests that revealed the absence of blood in Barrett's rectum. We do not consider, therefore, whether the plaintiffs' fear would have been reasonable had they been unaware of the medical evidence that blood had not been introduced into Barrett's rectum.

Furthermore, although the plaintiffs attempted to suggest at oral argument in this court that their fear of HIV may have also resulted from the contact between the blood and Barrett's buttocks, we note that this was not the factual or legal claim presented in their summary judgment documents. As we indicated previously, that claim rested on the assertion that Estaba had introduced blood into Barrett's rectum by the examination. Moreover, the plaintiffs offered no evidence that HIV could have been transmitted by that contact. See generally *Faya* v. *Almaraz*, supra, 329 Md. 445–46 (taking judicial notice of modes of transmission of HIV).

as the earlier claims and, therefore, relate back to the commencement of the action.[13] We disagree.

In paragraph fourteen of the first count of the proposed amended complaint, the plaintiffs stated as follows: "The Plaintiff, Allen Barrett, suffered a 'significant exposure' as defined by Connecticut General Statutes § 19a-581 (14) and Reg. § 19a-589-1 (o)." In light of our determination that this statutory provision is inapposite in this tort action, the paragraph was irrelevant and the trial court's denial of the plaintiffs' request to amend was harmless.

In the third and fourth counts of the plaintiffs' proposed amended complaint, the plaintiffs sought to add the following allegation: "On or about June 14, 1990, the Plaintiff, Allen Barrett, met with the Chief Executive Officer of the Defendant Hospital, an agent, servant or employee of the Defendant Hospital, regarding his care at the Defendant Hospital on June 13, 1990. The Plaintiff requested that the Defendant Hospital provide him with information regarding the HIV and health status of the persons whose blood was on the stretcher on which he had been sitting during his care at the Defendant Hospital on June 13, 1990. The Defendant Hospital, by and through its agents, servants and employees, refused the Plaintiff's request." Based on this allegation, the third count of plaintiffs' proposed amended complaint sought to add a claim for negligent infliction of emotional distress, and the fourth count sought to add a claim for intentional infliction of emotional distress.

"A cause of action is that single group of facts which is claimed to have brought about an unlawful injury to the plaintiff and which entitles the plaintiff

[13] The plaintiffs recognize that, if the proposed amendment did not relate back to the date of their original complaint, the proposed amendment would be barred by the statute of limitations.

to relief. . . . A right of action at law arises from the existence of a primary right in the plaintiff, and an invasion of that right by some delict on the part of the defendant. The facts which establish the existence of that right and that delict constitute the cause of action. . . . A change in, or an addition to, a ground of negligence or an act of negligence arising out of the single group of facts which was originally claimed to have brought about the unlawful injury to the plaintiff does not change the cause of action. . . . It is proper to amplify or expand what has already been alleged in support of a cause of action, provided the identity of the cause of action remains substantially the same, but where an entirely new and different factual situation is presented, a new and different cause of action is stated. . . ." (Citations omitted; internal quotation marks omitted.) *Gurliacci* v. *Mayer*, 218 Conn. 531, 546–47, 590 A.2d 914 (1991). Our relation back doctrine provides that an amendment relates back when the original complaint has given the party fair notice that a claim is being asserted stemming from a particular transaction or occurrence, thereby serving "the objectives of our statute of limitations, namely, to protect parties from having to defend against stale claims . . . ." Id., 548.

We conclude that the additional claims for negligent and intentional infliction of emotional distress arose out of different facts than those giving rise to the plaintiffs' original cause of action. The additional claims arose out of events that occurred the day after the events that were the subject of the original complaint, and address alleged emotional distress based on the actions of the hospital's chief executive officer, not based on the actions of Estaba and the hospital of which the plaintiffs originally complained. The injury alleged is emotional distress arising out of the words and action, or inaction, of the hospital's chief executive

officer, whereas the original allegations concerned Estaba's and the hospital's alleged negligence in allegedly exposing Barrett to potentially infected blood. "These complaints involve two different sets of circumstances and depend on different facts to prove or disprove the allegations of a different basis of liability. . . . The defendants did not have fair notice of the claim [that the actions of the chief executive officer caused the plaintiffs emotional distress] when the original complaint [only] alleged that [Estaba's alleged introduction of blood into Barrett's rectum caused the plaintiffs emotional distress]." *Sharp* v. *Mitchell*, 209 Conn. 59, 73, 546 A.2d 846 (1988). Accordingly, the trial court properly denied the plaintiffs' request to amend their complaint.

The judgment is affirmed.

In this opinion CALLAHAN, KATZ and PALMER, Js., concurred.

BERDON, J., dissenting. This case is not about whether we should recognize a cause of action for so-called AIDS phobia or HIV phobia—cases where a plaintiff claims as his only injury exposure to a person who has the human immunodeficiency virus which causes acquired immune deficiency syndrome. Therefore, this case does not require us to choose between the "actual exposure" test of injury; see, e.g., *Carroll* v. *Sisters of Saint Francis Health Services*, 868 S.W.2d 585 (Tenn. 1993); or the "reasonable fear" test of injury. See, e.g., *Faya* v. *Almaraz*, 329 Md. 435, 620 A.2d 327 (1993). Nor is this a case for unintentional infliction of emotional distress unaccompanied by physical injury or physical impact upon a plaintiff's body. See, e.g., *Montinieri* v. *Southern New England Telephone Co.*, 175 Conn. 337, 398 A.2d 1180 (1978). Rather, this is a simple case of medical malpractice in which the plaintiff Allen Barrett (Barrett) suffered a physical impact

upon his body and contemporaneous emotional distress. The law, under such circumstances, has always allowed such plaintiffs to recover damages for their emotional distress. Whether there is a rational basis for this claim of damages; *Petriello* v. *Kalman,* 215 Conn. 377, 380, 576 A.2d 474 (1990); is not an issue that is before us on this appeal.

The sole question in this case is whether, in order to satisfy the necessary elements for a cause of action in negligence, Barrett suffered a legally cognizable injury. In order to determine whether he suffered such an injury, the majority focuses strictly on the plaintiffs' allegation that the defendants introduced blood into Barrett's rectum during two rectal examinations. Because the evidence is clear that blood was not introduced into Barrett's rectum, the majority dismisses the plaintiffs' claim. Indeed, if this were the only allegation made by the plaintiffs, I would agree with the majority.

This, however, was not the only allegation made by the plaintiffs. The plaintiffs also alleged that the defendants negligently allowed Barrett to sit on a hospital stretcher where the cushion was oozing blood.[1] This

---

[1] The complaint alleged in relevant part: "14. There was a duty on the part of the Defendant Hospital, by and through its agents, servants and employees, to exercise that level of care, skill and treatment which is recognized as acceptable and appropriate by reasonably prudent similar health care providers.

"15. Despite the duty owed by the Defendant Hospital to the Plaintiff, Allen Barrett, the Defendant Hospital by and through its agents, servants and employees, committed the following negligent acts and omissions:

"(a) Failed to inspect, maintain, clean and repair its equipment.

"(b) Failed to supervise employees charged with inspecting, maintaining, cleaning and repairing its equipment.

"(c) Caused or allowed the stretcher to be in a defective, hazardous and dangerous condition.

"(d) Failed to warn the Plaintiff, Allen Barrett, as to the dangerous, defective, and hazardous condition when it knew, or through the exercise of reasonable care should have known, of said condition."

blood flowed out of the cushion and "covered [Barrett's] backside," leaving Barrett sitting in a pool of blood.[2] Barrett's affidavit[3] and the hospital records fully support these allegations.[4] The complaint, therefore, stated a colorable claim for medical malpractice in which the plaintiffs seek as an element of damages compensation for emotional distress.

[2] The complaint alleged in relevant part: "8. During the course of the examination, it became apparent to the Defendant Doctor that the Plaintiff, Allen Barrett, was sitting in blood and/or a blood-like material (hereinafter 'blood') and that the blood covered the Plaintiff's backside."

[3] Barrett's affidavit stated as follows:

"1. I am over the age of eighteen and believe in the obligation of an oath.

"2. I am one of the Plaintiffs in the above-captioned case. On June 13, 1990, I experienced severe pain in the area of my upper abdomen, which I recognized as a gall bladder attack, and came to the Danbury Hospital Emergency Room where I was received as a patient.

"3. I was examined by Victor Estaba, M.D. When Dr. Estaba and a nurse rolled me over to give me an injection for my pain, Dr. Estaba and the nurse noticed that my backside was covered with blood. Dr. Estaba performed a rectal examination, but he did not find the cause or source of the blood.

"4. My underpants were removed, I was given a 'johnny coat,' and clean sheets were put on the stretcher. I was returned to the stretcher. Sitting on the stretcher, I felt moisture on my backside. I noticed a large bloody area on my 'johnny coat' and on the sheet covering the stretcher at the location of my buttocks. Dr. Estaba performed another rectal examination, but he did not find the cause or source of the blood.

"5. At some point during my examination, I was given an injection in my buttocks.

"6. I got dressed. I realized that the blood that had covered my backside was not my blood. I removed the sheet from the stretcher and saw blood oozing from the stretcher. The blood was the blood of a prior patient or patients.

"7. When I saw the blood and realized that it had covered my backside and that Dr. Estaba had performed two rectal examinations and introduced the blood into my rectum, I became shocked and distraught and fearful that I might contract the AIDS virus, hepatitis or other blood product transmitted life threatening disease and that I might infect my wife, Mary Barrett."

[4] The hospital record provided in relevant part: "Blood was found to be leaking through broken vinyl area on stretcher mattress/cushion. The [patient] and his wife noticed this since it permeated to [the] sheet he was laying on!"

Moreover, these allegations make clear that this is not a case like *Montinieri* v. *Southern New England Telephone Co.*, supra, 175 Conn. 337, in which we held that a plaintiff may recover for emotional distress even in the absence of physical injury or physical impact upon his body, provided that "the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm." Id., 345. On the contrary, in this case, Barrett did suffer a physical impact when his body came into contact with the blood on the stretcher. This court always has allowed a plaintiff to recover for emotional distress as an element of damages when that distress is accompanied by a physical impact which resulted from the defendant's negligence, without the necessity of proving that the emotional distress was foreseeable.[5] See generally *Figlar* v. *Gordon*, 133 Conn. 577, 585, 53 A.2d 645 (1947); *Orlo* v. *Connecticut Co.*, 128 Conn. 231, 235, 21 A.2d 402 (1941); D. Wright & J. Fitzgerald, Connecticut Law of Torts (2d Ed. 1968) § 172; D. Faulkner & K. Woods, "Fear of Future Disability—An Element of Damage in Personal Injury Action," 7 W. New Eng. L. Rev. 865 (1985).[6]

---

[5] The majority incorrectly states that "there was no allegation that [the blood covering Barrett's buttocks] caused his fear, nor was there any evidence offered by the plaintiffs' affidavits to suggest that such exposure reasonably could lead to infection with HIV or any other blood-borne disease." On the contrary, the complaint clearly alleged negligence by the defendants in placing Barrett on the blood laden stretcher and in allowing his backside to be covered in blood; see footnotes 1 and 2 of the dissenting opinion; and also clearly alleged that "[a]s a direct and proximate result of the negligent acts and omissions of the Defendant Doctor, the Plaintiff, Allen Barrett, has suffered and is suffering and will permanently suffer anxiety, fear and mental anguish caused by his belief that he may contract the AIDS virus, hepatitis or other blood product transmitted life threatening disease."

[6] The majority, in suggesting that I have abandoned the approach of *Montinieri*, mischaracterizes this dissent. On the contrary, I agree that *Montinieri* presents a viable rule of law in cases where a plaintiff who has not

The impact necessary to support such emotional distress damages "has been found satisfied by the most trivial of impacts." F. Harper, F. James & O. Gray, Torts (2d Ed. 1986) § 18.4, p. 686; see *Block* v. *Pascucci*, 111 Conn. 58, 64, 149 A. 210 (1930). Indeed, as Professor Keeton points out in his treatise, one court "reduced the matter [of satisfying the requirement of physical impact] to something of an absurdity by finding 'impact' where the defendant's horse 'evacuated his bowels' into the plaintiff's lap." W. Prosser & W. Keeton, Torts (5th Ed. 1984) p. 364. Surely, the defendants' negligent act of having Barrett sit on a hospital stretcher which leaked foreign blood and "covered [his] backside" in this blood was a sufficient impact.

I write at length, rather than merely summarily dissenting, because I fear that this holding of the majority, based upon the undisputed facts, can significantly undermine the development of our law on the tort of negligent infliction of emotional distress.

Accordingly, I respectfully dissent.

---

suffered any physical impact or physical injury nevertheless seeks compensation for emotional distress. The facts of this case, however, do not require us to rely on that doctrine, because Barrett suffered a physical impact when he sat in a pool of blood on the stretcher. In other words, as a result of the negligence of the defendants, Barrett suffered a physical impact and accompanying emotional distress. The rule of *Montinieri*, therefore, does not apply here.

I am concerned that the majority, by relying on *Montinieri* in this case, may alter a plaintiff's burden of proof in future cases involving emotional distress damages. *Montinieri* requires a plaintiff who has not suffered any physical impact or physical injury to prove that his emotional distress was foreseeable by the defendant. In cases where the plaintiff has suffered a contemporaneous physical impact or physical injury, however, this is not the law. We do not require such plaintiffs to prove that their emotional distress was foreseeable before allowing recovery. Thus, I am concerned that the majority's reliance on *Montinieri* in this case, where Barrett did suffer a physical impact, may inject the foreseeability requirement into all future cases in which a plaintiff seeks to recover *damages* for emotional distress.