[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiffs bring this action alleging that the negligence of the defendants in the maintenance of the City of Waterbury sanitary sewer system caused a sewer backup that substantially damaged the plaintiffs' home. The plaintiffs Laurent and Irene Voghel were the owners of a single family home at 214 Clough Road, Waterbury in August of 1994, when the sewage backup occurred. The defendants are the City of Waterbury and Robert Carroll, the superintendent of the Waterbury street department, Ronald Jennings, supervisor of the Waterbury sewage department, and Ernest Phillips, supervisor of the Waterbury engineering department. The defendants deny that they were negligent. They also filed two special defenses contending that they are immune from liability under the common law doctrine of governmental immunity and under General Statutes § 52-557n(2)(B).
On August 21, 1994, after it had rained heavily for much of the day, the plaintiffs arrived at their home after having dinner out to find that the first floor and basement of their home were inundated with a substantial amount of sewage, which included human excrement, mud, water, twigs, sticks and debris. The sewage entered the home through the first floor bathroom sink, toilet and shower head under great pressure. The home was filled with a horrible smell from the sewage. The plaintiffs' home and its contents were significantly damaged.
The parties disagree as to the cause of the sewage backup. Clough Road is served by a sanitary sewer line, but is not served by a stormwater drainage sewer. The plaintiffs contend that two stormwater catch basins in Clough Road near their home improperly emptied stormwater into the sanitary sewer line in Clough Road, causing an overload of the sanitary sewer pipe and a partial blockage of the sanitary sewer line, which in turn caused the sewage to back up into the plaintiffs' home. The plaintiffs' engineering expert was Kenneth Black, a consulting civil engineer with experience in water resource engineering and sewer hydraulics. Black has B.S., M.S. and Ph.D degrees in civil CT Page 12138 engineering and taught engineering at the college level for over ten years.
Black testified that it is a poor engineering practice to have storm drains connect to sanitary sewer lines. Such connections do exist in many cities, but the better practice, he said, is to reconnect stormwater drains to a stormwater sewer or to abandon the old drains and build a new storm drainage system. Article V of the Waterbury sewer ordinance prohibits the connection of stormwater drainage to any sanitary sewer. One of the significant problems with the connection of stormwater drains to a sanitary sewer line is the possibility of overwhelming the normally small, 8 to 10 inch sewer pipe with a large amount of stormwater and the sticks and leaves that enter catch basins and cause blockages in small pipes. Stormwater drainage pipes, Black testified, are usually at least 15 to 18 inches wide to accommodate these blockages and large amounts of stormwater.
On September 16, 1994, approximately one month after the sewage backup at the plaintiffs' home, Black examined the stormwater catch basins on Clough Road that were closest to the plaintiffs' house. By using a technique called smoke testing, he determined that the two catch basins closest to the plaintiffs' home, referred to as "A" and "B," were connected to the sanitary sewer line and that they were clean, operable and unobstructed.
He then examined the many photographs that the plaintiffs had taken of the sewage in their home. He saw considerable fecal material as well as sticks, leaves and debris, which demonstrated in his opinion that there was a sewer backup involving stormwater from the catch basins. Black testified that it was his opinion that the sewage backup in the plaintiffs' home was caused by the entry of a large volume of stormwater into the small sewer pipe in Clough Road, aggravated by the sticks and leaves, which caused a partial blockage of the sanitary sewer that was hydraulically released through the sewer connection to the plaintiffs' home. He further stated that the connection of catch basins "A" and "B" to the sewer line was a substantial factor in causing the sewage backup.
Black acknowledged that there was some evidence that catch basin B was blocked when examined by others on June 3, 1994 and stated that if it remained blocked on August 21, 1994, the stormwater that entered catch basin A alone would have been sufficient to overwhelm the sewer line. Catch basin A was the one CT Page 12139 located closest to the plaintiffs' home. With reference to two catch basins further uphill on Clough Road, known as "C" and "D," which were connected to a storm sewer line in an intersecting street, he testified that the water from an intense storm could flow past C and D because of the steep grade in the road as it extends downhill past C and D. He concluded his testimony by stating that the sewage backup would not have occurred if catch basin A were not connected to the sanitary sewer line.
The defendants also presented expert engineering testimony. Their expert was Bruce Kirkland, a consulting engineer with a B.S. and M.S. in engineering. Kirkland was employed by Camp, Dresser McKee, consulting engineers who were hired by the City beginning in July 1992 to perform various tests and analyses concerning the City's sanitary sewer system. In June, 1994, before the sewage backup at issue, Camp, Dresser McKee smoke tested the catch basins on Clough Road and determined that catch basin A was emptying into the sanitary sewer line, that catch basin B was clogged with sand and dirt and that catch basins C and D were properly connected to a storm sewer line in an intersecting street. This information was conveyed to the City in a written report dated July 29, 1994. On August 31, 1994, ten days after the sewage backup at the plaintiffs' home, Kirkland and other Camp, Dresser McKee representatives examined the Clough Road catch basins once again at the City's request. They found that catch basin A was still emptying into the sanitary sewer line and that catch basin B was now physically plugged with brick and concrete. They also determined that there were no curbs anywhere on Clough Road and that the east side of Clough Road is higher than the west side, where the plaintiffs' home is located. They further found that there was a ditch along the east side of the road that collects water coming down the road and that sump pumps from homes along the east side of the road were still discharging water into the ditch on August 31. Kirkland testified that in his opinion the stormwater entering catch basin A was small in volume because of: (1) the lack of curbing along Clough Road, which leads to water going across lawns; (2) the existence of the ditch; and (3) the fact that catch basin C, also located on the east side, was collecting a large amount of the stormwater going down Clough Road. He further concluded that the amount of stormwater entering the system from catch basin A was smaller than the capacity of the sewer line and catch basin A therefore was not the cause of the sewer backup at the plaintiffs' home. He also acknowledged that Camp, Dresser McKee had recommended the removal of catch basins A and B because they are inefficient and CT Page 12140 do not serve any function relating to stormwater drainage.
On cross-examination, Kirkland admitted that it is improper to connect stormwater catch basins to a sanitary sewer line and that such connections violate the City's sewer ordinance. He further admitted that he did not know what caused the sewer backup into the plaintiffs' home because he was not asked to determine the cause. His opinion was limited to the role of catch basin A in the sewer backup. Kirkland admitted that Clough Road is "crowned," meaning that the center of the road is highest and the road slopes down toward both sides, and that catch basin A is at the edge of the east side of the road. He also admitted that the lawns on the east side slope toward catch basin A. Although initially evasive, he did concede that if sticks and twigs were found in the plaintiffs' home as part of the sewage backup, they most probably entered the sewer line from a catch basin.
The court found Black's testimony far more persuasive than Kirkland's. Black's analysis was comprehensive and plausible. Kirkland's analysis, limited as it was to the role of catch basin A in the sewage backup and lacking an opinion as to the cause of the sewage backup, was considerably less persuasive. Furthermore, photographs submitted into evidence showed that water traveling down the east side of Clough Road would be funneled toward catch basin A, not dissipated in the area around it as Kirkland concluded. The court credits Black's testimony and finds that the sewage backup was caused by a large volume of stormwater as well as sticks and leaves entering the sewer line from catch basin A, and perhaps catch basin B as well, which overwhelmed the sewer line and caused a blockage of it that led to the sewage backup into the plaintiffs' home.
The court further finds that it is a poor engineering practice for catch basins to be connected to a sanitary sewer line, that such connections are in violation of Waterbury's sewer ordinance and that the City was aware in May 1993, if not earlier, that catch basins A and B on Clough Road were connected to the sanitary sewer line. The defendant Ernest Phillips, the city engineer, testified that after catch basins C and D were installed in May 1994, he intended to plug up catch basins A and B, which he called "Mickey Mouse catch basins." The defendants were negligent in failing to disconnect catch basins A and B from the sanitary sewer line, and that failure was a substantial factor in causing the sewage backup at the plaintiffs' home. (The parties have consistently treated all of the defendants together CT Page 12141 for liability purposes; neither side has separately analyzed the liability of the individual defendants.)
The defendants contend in their first special defense that they are immune from liability under the common law doctrine of governmental immunity. (The defendants failed to brief their claim of immunity under General Statutes § 52-557n(2)(B) and their second special defense based on that statute is therefore deemed abandoned. Collins v. Goldberg, 28 Conn. App. 733, 738
(1992).) A municipality and its employees have a qualified immunity when performing discretionary governmental duties. Evonv. Andrews, 211 Conn. 501, 505 (1989). They are not immune, however, in the performance of ministerial acts, which are duties to be performed in a prescribed manner without the exercise of judgment or discretion. Id.
In a case where the City of Waterbury was the defendant, our Supreme Court ruled, "[T]he work of constructing drains and sewers, as well as that of keeping them in repair, is ministerial, and the municipality is responsible for negligence in its performance." Spitzer v. Waterbury, 113 Conn. 84, 88
(1931). Waterbury was not found liable in the Spitzer case because the plaintiffs' claim was that the drains and sewers were not adequate for an extraordinary storm or flood, as opposed to ordinary weather conditions. There is no dispute in this case that the rain storm that occurred on August 21, 1994 was within the range of ordinary weather conditions. The defendants therefore are liable for those damages that were proximately caused by their negligence. The court finds for the plaintiffs on the defendants' first special defense.
With respect to damages, the court notes that the Voghels claim damages for all of the consequences suffered as a result of the sewage backup. Their, claim includes a subrogation claim for the benefit of their insurance carrier, Atlantic Mutual, which was represented by separate counsel at trial. Counsel for both the Voghels and Atlantic Mutual stipulated at trial that the court need not enter judgment for separate amounts as between the Voghels and their carrier. Counsel for those parties represented that they would agree to an allocation of the damages awarded as between the Voghels and their insurer. The defendants' repeated objections to damages claimed by the plaintiffs on the ground that the plaintiffs were compensated by the insurer are therefore without merit; counsel for the defendants fails to recognize that Atlantic Mutual is making a subrogation claim. CT Page 12142
The first item of damages claimed by the sellers is $37,281 for the loss in the fair market value of their home as a result of the sewage backup. There is no dispute that the fair market value of the home on August 21, 1994, prior to the sewage damage, was $140,000. After the backup and repairs to the house, the plaintiffs placed their home on the market. They informed each prospective purchaser about the sewage backup. The home was sold by the plaintiffs in March, 1996 for $110,000, from which the plaintiffs received net proceeds of $102,719. They seek judgment for the difference between the fair market value of the home prior to the backup and the net proceeds they received, which is $37,281.
The defendants contend that there is no evidence that the loss in value of the home was the result of the sewage backup; they claim it could have been attributable to "market forces" between August, 1994 and March, 1996. Given that the plaintiffs told each prospective purchaser about the sewage damage, the court infers that this disclosure had a negative impact on the value of the home and the decrease in value was attributable to the sewage damage caused by defendants' negligence. The defendants also argue that the plaintiffs should be awarded only $30,000, the difference between the original fair market value, $140,000, and the later sales price, $110,000, without a deduction for expenses of sale. The court agrees and awards the plaintiffs $30,000 for the loss in value of their home.
With respect to the contents of the home, the plaintiffs stated in their brief that they seek damages of $51,128.82, the actual cash value of the contents that were lost plus 6% sales tax and 5% for debris removal. Kenneth Ursaki, a public adjuster retained by the plaintiffs, testified that he estimated the actual cash value of the contents at $48,500; however, Atlantic Mutual paid the plaintiffs only $38,491. The court credited Ursaki's testimony. The court awards the plaintiffs damages for the actual value of the lost contents plus sales tax and debris removal in the amount of $51,128.82.
The plaintiffs also claim as damages the expenses of their unoccupied Clough Road home from August 21, 1994, the date of the backup, to March 1, 1996, when the property was sold. Included in the claim are such items as utility bills, real estate taxes, liability insurance and lawn maintenance. The defendants contest the propriety of an award of such damages. The plaintiffs have CT Page 12143 cited two cases in support of this claim, Scovill v. Ronalter,162 Conn. 67, 76 (1971) and Housing Authority v. Lustig,139 Conn. 73, 76 (1952). Neither of these cases supports the plaintiffs' claim. The court declines to award damages relating to the unoccupied Clough Road home because the plaintiffs are also seeking an award of damages for their living expenses at the condominium they rented from October, 1994 until April 30, 1996, when they moved into a new home. If the sewage backup had not occurred, the plaintiffs would have incurred the expenses they seek for their Clough Road home while they lived there. The occurrence of the sewer backup does not give rise to a valid claim to be compensated for both their living expenses at the condominium and the ongoing expenses for Clough Road. Such a result would constitute a double recovery, leaving the plaintiffs wholly free of any obligation to pay for any of their living expenses during the period between the sewage backup and the sale of the Clough Road home.
The plaintiffs also seek damages of $19,462.67 for their living expenses at a rented condominium, including rent, utilities and moving expenses from October, 1994 until April 30, 1996. (Until October, 1994, the plaintiffs lived at their daughter's home.) The defendants contest compensation for the condominium expenses for any period after May 31, 1995. However, there was no evidence that the Clough Road home could have been inhabited once again as of that date. A report obtained by the plaintiffs in August, 1995 recommended that further work be done to insure that all contamination was removed, so the court finds that the house was not fit for occupation in August. Given that the plaintiffs did not settle with their insurance carrier, Atlantic Mutual, until October, 1995, it was only then that they had the financial ability to investigate the purchase of a new home. It is not unreasonable that it took six months to consummate the sale of a new home. The court awards damages of $19,462.67.
The plaintiffs also contend that they paid certain cleaning and other expenses for which they seek compensation. These bills include bills for cleaning the plaintiffs' clothing, cleaning their home and testing the home for contamination. The court finds these expenses were reasonably incurred and awards the full amount claimed, $12,330.76.
The plaintiffs' next claim is for the 10% fee that they paid to the adjuster they retained to negotiate on their behalf with CT Page 12144 Atlantic Mutual, the plaintiffs' insurer. The fee paid was $9,543.95. The plaintiffs have cited no precedent for awarding an adjuster's fee as an item of damages with respect to a negligence claim. The defendants oppose an award of the fee as damages, contending that an adjuster's fee is analogous to an attorney's fee, which generally is not recoverable as damages unless a statutory or contractual provision provides for such an award.Raph v. Vogeler, 45 Conn. App. 56, 65 (1997).
An adjuster's fee is substantially analogous to an attorney's fee on the facts of this case. The plaintiffs were free to negotiate their claim directly with their insurance carrier, but they elected to hire and pay an appraiser to act on their behalf. Likewise, the plaintiffs could have brought this action pro se, but instead decided to hire and pay counsel to represent them. Given the absence of any authority supporting an award of the adjuster's fee as damages, the court declines to make such an award.
The final item of damages claimed by the plaintiffs is damages for the emotional distress that the plaintiffs experienced in seeing their home of twenty years, and much of its contents, substantially damaged by sewage. The test for an award of damages for unintentional infliction of emotional distress is well-established. Such damages can be awarded if the defendants should have realized that their conduct involved an unreasonable risk of causing emotional distress and that such distress might result in illness or bodily harm. Barrett v. Danbury Hospital,232 Conn. 242, 260 (1995). This test was first established in Connecticut in Montinieri v. Southern New England Telephone Co.,175 Conn. 337 (1978). In Barrett, our Supreme Court interpreted the first part of the Montinieri test as requiring "that the fear or distress experienced by the plaintiffs be reasonable in light of the conduct of the defendants. If such a fear were reasonable in light of the defendants' conduct, the defendants should have realized that their conduct created an unreasonable risk of causing distress, and they therefore would be held liable."Barrett v. Danbury Hospital, supra, 232 Conn. 261.
The facts concerning the plaintiffs' damages for emotional distress are as follows. The plaintiffs lived in their home on Clough Road for approximately twenty years and raised all ten of their children there. Mr. Voghel, who was semi-retired, was a builder and kept a home office in the house. Mrs. Voghel was a homemaker who enjoyed taking care of their home and babysitting CT Page 12145 their grandchildren. When they arrived home on August 21, 1994 they found the first floor of the house saturated in water and sewage about one and one-half inches deep. The sewage and water left water marks as high as three inches deep, but the water was draining down into the basement when they arrived. A disgusting odor permeated the interior of the home. Sewage was splattered five to six feet high in the shower. Excrement and toilet paper adhered to walls, carpets and floors. Many irreplaceable items were destroyed — photographs of the Voghels' children when young, photographs of the Voghels' parents, artwork that the children had done, and similar items. Mrs. Voghel was so distressed that she could not re-enter their home for four months. After the house had been thoroughly cleaned, she still could not tolerate the residual odor in the home and the memory of its condition after the sewage backup. The plaintiffs therefore decided to sell the house and purchase a different one. Mrs. Voghel still gets headaches and weeps when she remembers the Clough Road house and the sewage backup.
The court finds that the severe distress experienced by the plaintiffs was reasonable in light of the defendants' negligence. The defendant city engineer testified that he had seen dozens of sewer backups during his career and that although the basement of a home usually suffers the most damage, in the Voghels' case, the first floor living quarters suffered terrible damage. It was reasonably foreseeable that a sewer backup into a home and the ensuing contamination of the home and its contents would cause great emotional distress to the owners. The second factor in theMontinieri test is whether the defendants should have known that the distress caused by their negligence might result in illness or bodily harm. Montinieri v. Southern New England Telephone Co., supra, 175 Conn. 345. Proof of an ensuing bodily injury, however, is not required. Id. The court finds that the defendants should have known that the severe distress experienced by the plaintiffs might result in illness or bodily harm. It is, of course, difficult to measure emotional distress and to award fair and reasonable damages for it. The plaintiffs seek damages of $150,000 for each of them for emotional distress. Having listened carefully to the testimony of both plaintiffs and having examined the numerous photographs that show the extent of the sewage backup into the plaintiffs' home, the court awards the plaintiff Irene Voghel damages of $25,000 for negligent infliction of emotional distress and the plaintiff Laurent Voghel damages of $20,000 for negligent infliction of emotional distress. CT Page 12146
Judgment is entered for the plaintiffs against the defendants for compensatory damages of $157,922.25. The file reveals that on September 25, 1998, the plaintiffs filed an offer of judgment for $105,000, which was not accepted by the defendants. Therefore, the plaintiffs are also awarded interest at the rate of twelve per cent per year on the amount of the judgment from September 25, 1998 until the date of the entry of judgment.
VERTEFEUILLE, J.