PAUL MONTINIERI ET AL. *v.* SOUTHERN NEW ENGLAND
TELEPHONE, COMPANY

LOISELLE, SPEZIALE, SIDOR, RUBINOW and SPONZO, Js.

Argued April 7—decision released July 4, 1978

338

*Elliott B. Pollack,* with whom, on the brief, was *Joel N. Sable,* for the appellants (plaintiffs).

*John F. Scully,* with whom were *Louis B. Blumenfeld* and *James B. Curtin* and, on the brief, *Vincent M. DeAngelo,* for the appellee (defendant).

RUBINOW, J. The plaintiffs brought this action in three counts. Each count is based, in substance, upon the claim that a directory-assistance operator of the defendant wrongfully disclosed the address of the plaintiffs to a member of the public. The first count alleged a breach of contract; the second count, negligence; and the third count, invasion of privacy.

The trial court directed a verdict for the defendant on the first and third counts and submitted to the jury the cause of action alleged in the second count. The jury rendered a verdict for the defendant on the second count, and, pursuant to the direction of the court, on the first and third counts. After judgment was rendered on those verdicts, an appeal was taken, claiming error with respect to the second count only.

I

The series of events leading to this litigation began around the middle of April, 1971, when a convict named Richard Wilson was released from a correctional facility in Attica, New York, where he had been serving a five-year term. Having read in a newspaper about a bank officer's family that had

been held hostage until the bank paid for the family's release, Wilson conceived a plan for obtaining money in a similar way. To put his plan into effect, he came to Hartford and on April 21, 1971, by inquiries at the South End Bank, learned that among that bank's officers was one named Paul Montinieri.

At that time, Montinieri lived in Wethersfield. He had an unlisted telephone number for his home and, consequently, neither his home address nor his home telephone number was listed in the telephone directory. The directory did have a listing, however, for a subscriber in Bloomfield with an almost identical name, Paul Montineri. Early that afternoon, Wilson, assuming that the Bloomfield Paul Montineri was an officer of the South End Bank, went to the home of the Bloomfield Montineris. While Mrs. Montineri was in the cellar, Wilson gained entrance to the home. He then held Mrs. Montineri and her ten-year-old son hostage there. Later that afternoon, her husband and an older son, Joseph, came home. They were able to convince Wilson that he was not at the home of the South End Bank officer he was looking for.

Wilson then had Joseph telephone the South End Bank to inquire where the bank officer was at that time; Joseph was informed that Montinieri was at home. At Wilson's direction and at the point of Wilson's gun, Joseph then called the directory-assistance operator of the defendant to find out the home address of Montinieri, the bank officer. The operator declined to give that specific information directly. Nevertheless, because Joseph had been told by his mother that the Montineris lived in Wethersfield on Quail Hill Road, he was able by a series

of questions to get the operator to confirm as correct one of the two street numbers he suggested as the address of the Wethersfield Montinieris.

Wilson then directed the Bloomfield Paul Montineri, again at the point of the gun, to drive Wilson to the Montinieri house in Wethersfield. There, he threatened Mrs. Montinieri with the revolver and forced her to admit him to her home. Two of the Montinieri children escaped, however; they ran to the home of a neighbor and asked him to call the police.

Shortly thereafter, officers from the Wethersfield police department arrived and surrounded the Montinieri residence. For over an hour, Mrs. Montinieri and her husband were held hostage by Wilson. During this time they were in constant fear for their personal safety and suffered extreme terror. Fortunately, the Wethersfield police were then able to negotiate the release of the Montinieris and, several hours later, captured Wilson after shooting him.

In spite of their ordeal, none of the plaintiffs sought medical attention after the incident, and they sustained no physical injury.[1]

## II

Although the plaintiffs alleged in the second count of their complaint that the defendant failed to keep a promise not to disclose their home address, the gravamen of that count, as previously noted, is negligence. Hence, even if the plaintiffs proved that the defendant had made, and had not kept, the promise, that circumstance did not ipso facto entitle

---

[1] The summary contains essentially undisputed facts, derived from each party's statement of facts, as set forth in the brief of each party pursuant to Practice Book, 1963, §§ 631A (b) and 632A (b).

the plaintiffs to a recovery on the second count. "[A] mere breach of the contract would not afford a basis for a recovery in tort, but the necessary elements to establish negligence must be shown." *Dean* v. *Hershowitz,* 119 Conn. 398, 409, 177 A. 262 (1935). Although a promise may be the basis out of which a duty to exercise care arises, the promise "in no way measures the extent of that duty. . . . [T]he plaintiff[s] cannot recover without proving the necessary elements to establish negligence on the defendant's part." *Chipman* v. *National Savings Bank,* 128 Conn. 493, 496, 23 A.2d 922 (1942).

Concerning one of those "necessary elements to establish negligence on the defendant's part," the trial court charged the jury as follows: "Unless the act on the part of the defendant was intentional, and there's no claim of intentional wrongdoing here . . . then a defendant is not liable for emotional distress unless the defendant, or its agents or servants, should have realized that its conduct involved an unreasonable risk of causing the distress, and from the facts known to it, or its agents, should have realized that the distress, if it were caused, might result in illness or bodily harm. This area of emotional damages is a new area in the law, relatively speaking, and, therefore, before the Court will allow emotional damages, I repeat again, a defendant should have realized that its conduct involved an unreasonable risk of causing the distress, and from the facts known to it, should have realized that the distress, if it were caused, might result in illness or bodily harm."

The plaintiffs claim that the trial court erred in charging the jury to this effect. They claim that, instead, the court should have charged, on the

authority of *Orlo* v. *Connecticut Co.,* 128 Conn. 231, 21 A.2d 402 (1941), that the plaintiffs were entitled to recover for their emotional distress[2] if they were within the "zone of danger" created by the defendant's conduct.

In *Orlo,* we held that where negligence causes fright or shock in a person within the range of physical danger from that negligence, and the fright or shock causes injuries that are recognized as elements of damage if bodily injuries are inflicted, the plaintiff may recover, even though there was no impact and no bodily injury contemporaneous with the shock or fright. The court expressly noted (p. 235) that *Orlo* is not "concerned with a situation where the party claiming to recover was not within the range of ordinary physical danger from the negligent conduct claimed." The court also noted: "It may be granted that . . . there can be no recovery for mere fright, nervous shock or other mental disturbance where there is no outward manifestation of their effects, upon the very logical ground that the law has never regarded these mental states standing alone as a legal injury." Ibid. These comments by the court in *Orlo* make it clear that *Orlo* did not purport to answer the question whether a defendant may be liable for unintentionally-caused emotional distress if either the plaintiff claims no harm other than emotional distress or the defendant's conduct does not "create a range of physical danger."

---

[2] In this appeal, the plaintiffs are claiming damages for emotional distress only. Although the second count refers to property damage, the trial court's charge does not mention property damage, and the plaintiffs' brief does not claim recovery for property damage.

In three cases subsequent to *Orlo,* this court considered issues peripheral to, but not decided by, the holding in *Orlo.* In *Urban* v. *Hartford Gas Co.,* 139 Conn. 301, 93 A.2d 292 (1952), the complaint alleged that the conduct of the gas company's employees caused emotional distress that led to bodily harm. There was, however, no allegation of either physical impact or danger therefrom. We held the employees' conduct, nevertheless, would make the gas company liable for the bodily harm, if the employees should have realized that the conduct involved an unreasonable risk of causing the distress and that the distress might result in illness or bodily harm.

In *Strazza* v. *McKittrick,* 146 Conn. 714, 156 A.2d 149 (1959), we held that where a defendant negligently causes a physical impact, a plaintiff within the range of the harm likely to be caused by that impact may recover for emotional distress, even if no consequential injuries are sustained.

In *Bertozzi* v. *McCarthy,* 164 Conn. 463, 323 A.2d 553 (1973), the trial court had sustained an objection to a question designed to elicit evidence concerning an "emotional or physical reaction" as a consequence of a breach of contract. The trial court's ruling was affirmed by this court on the ground that the proponents of the evidence had "nowhere alleged, much less proved" that the plaintiff, against whom recovery was being sought on a counterclaim, had "unreasonably created a risk of distress or should reasonably have foreseen that it might result from any action on his part." Id., 469, 470. This court's opinion cited the decision in *Urban* and what is now Restatement (Second), 2 Torts § 313 (1965). Both of those relate to liability for

bodily injuries resulting from emotional distress, rather than liability for emotional distress alone. Hence, our statement in *Bertozzi* concerning the circumstances under which a party may be liable in damages for unintentionally-caused emotional distress applied only to cases where the unintentionally-caused emotional distress resulted in bodily injury.

Nevertheless, there is no logical reason for making a distinction, for purposes of determining liability, between those cases where the emotional distress results in bodily injury and those cases where there is emotional distress only. In a comment on *Wilkinson* v. *Downtown*, [1897] 2 Q.B. 57, a case cited in *Urban*, supra, 306, Judge (then Professor) Magruder wrote: "[S]uppose . . . [Mrs. Wilkinson] had only suffered keen anguish of mind, for a few hours, with none of the ensuing bodily illness. A man from Mars would find it difficult to understand the denial of recovery for mental anguish in such a case, when a person is allowed to recover $1200 for the indignity of being spit upon in the presence of others. Surely the law should afford Mrs. Wilkinson a remedy for the outrageous aggression upon her mental and emotional tranquility; otherwise the tendency would be for the victim to exaggerate symptoms of sick headaches, nausea, insomnia, etc., to make out a technical basis for bodily injury, upon which to predicate a parasitic recovery for the more grievous disturbance, the mental and emotional distress she endured." Magruder, "Mental and Emotional Disturbance in the Law of Torts," 49 Harv. L. Rev. 1033, 1059 (1936). *Wilkinson* is a "practical-joker" case, with ensuing bodily illness, but the rationale for not insisting that, as a condition precedent to

liability, there be an ensuing bodily illness is clearly applicable also to cases where the emotional distress is unintentionally caused.

Accordingly, we hold that recovery for unintentionally-caused emotional distress does not depend on proof of either an ensuing physical injury or a risk of harm from physical impact. Nevertheless, we recognize that the protection the law accords to "the interest in one's peace of mind"; Magruder, op. cit., 1035; must be limited so as not to "open up a wide vista of litigation in the field of bad manners, where relatively minor annoyances had better be dealt with by instruments of social control other than the law." Ibid.

Much has been written by both legal scholars and judges about the reasons for and extent of those limits. Many of the cases and articles are referred to in an annotation, "Torts—Emotional Disturbances," 64 A.L.R.2d 100 (1959). The limits set by the trial court in its charge were, in substance, that the defendant would not be liable unless the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm. This charge applied to the present case the same standard of care that is set forth in *Urban* and Restatement (Second), 2 Torts § 313 (1965) for those cases where unintentionally-caused emotional distress results in an ensuing bodily injury. Because recovery for unintentionally-caused emotional distress should not depend on proof of an ensuing bodily injury, that *Urban* and Restatement standard of care also applies to cases, like the present one, where a plaintiff seeks recovery only for unintentionally-caused emotional distress. The trial court's charge, there-

fore, correctly informed the jury what standard of care the jury was to apply in determining what conduct of the defendant was a necessary element to establish negligence on the defendant's part.

## III

The plaintiffs claim further that the trial court erred in another part of its charge. In that part, the trial court charged as follows: "The defendant has requested that the court mention the factor that they have claimed, the defendant has claimed in its presentation of its case, that the plaintiffs had surrendered part of their privacy to the public domain, by virtue of getting a motor vehicle operator's license, a registration for motor vehicles, by having the names of the family in the public record, by virtue of the City Directory, and also other ways. That, of course, is a factor for you to consider or to weigh as you desire. You are the ones to weigh those factors, to accept or reject them as you wish."

When the evidence referred to by the court was admitted, the plaintiffs were still proceeding on the privacy count, and the evidence was relevant to that count. The evidence was also relevant, however, to the second count. With respect to that count, the thrust of the evidence was that the plaintiffs had made their address public in many different ways. If the jury credited this evidence, they could reasonably infer that it was not probable that the plaintiffs would request the defendant to promise to keep their address confidential, and that it was not probable that the defendant had either promised to keep the address confidential or believed that it was under a duty to do so. Further, the evidence included many checks bearing the printed name and address of the plaintiffs. Several of these were

made out to the defendant; the jury could infer from this publication of the plaintiffs' address that there was no reason for the defendant to believe that disclosing the address of the plaintiffs involved an unreasonable risk of causing distress to the plaintiffs.

The court did not charge the jury that they should find for the defendant if they found that the plaintiffs "had surrendered part of their privacy to the public domain." What the court said, in effect, was that surrender was a factor for them "to consider or to weigh as you desire." By that instruction, the court left it to the jury to determine what issues, if any, they were to consider that surrender relevant to. As previously noted, the jury could have found it relevant to at least two questions of fact raised under the second count.

## IV

The plaintiffs' remaining claim is that the court erred in admitting into evidence a tariff of the defendant relative to unpublished service. This tariff was approved by the public utilities commission on or about June 10, 1969. At the time that the tariff was offered, the plaintiffs were proceeding under all three counts. In the first count, they alleged that their contract for unpublished telephone listing service was entered into "[o]n or about May, 1969." The trial court admitted the tariff on the ground that it was evidence of the "invariable custom" of the defendant, "which is not necessarily binding upon the triers of the facts but is admissible evidence . . . . You can show the company practice on unlisted telephone numbers, even though you can't identify this particular individual's negotiations."

The plaintiffs did not, and do not now, challenge the court's ruling that evidence of the customary practice is evidence of what was done on a particular occasion. See *Boston Lumber Co.* v. *Pendleton Brothers, Inc.,* 102 Conn. 626, 629, 129 A. 782 (1925). Nor do the plaintiffs claim that the tariff was not evidence of the customary practice. Their primary objection is that the tariff should not have been admitted into evidence because the court (*Longo, J.*) had previously sustained a demurrer to special defenses that set forth the terms of the tariff.

Section 2 and section 11 of the tariff contained provisions for a limitation of the defendant's liability. The court sustained the demurrer as to those sections on the ground that the limitation did not apply to a cause of action based on a disclosure of a residence address. That ruling did not, however, foreclose the defendant from offering the tariff into evidence if it was relevant to any issue in the case. If, as claimed by the defendant, the terms of the tariff constituted the terms of the contract, then the absence in the tariff of any promise not to disclose the address of a subscriber was relevant to the defendant's claim that there was no such promise.

The plaintiffs claim that the true purpose of the offer of the tariff was to get before the jury the limitation-of-liability provisions of the tariff. Those limitations did not, however, purport to limit the liability of the defendant under the cause of action alleged in the second count, and the trial court made no reference to limitation of liability in its charge. Instead, with reference to the tariff, the court's charge referred to both the defendant's claim that the tariff was the governing contract and the plaintiffs' claim that the tariff was never communicated

to the plaintiffs and was, therefore, not binding upon the plaintiffs. If the plaintiffs desired to have the limitation of liability not go before the jury, a motion to have those portions excised from the tariff should have been made. See *Mucci* v. *LeMonte*, 157 Conn. 566, 570, 254 A.2d 879 (1969). The trial court did not err in admitting the tariff as an exhibit.

There is no error.

In this opinion the other judges concurred.

