## CAROLYN WITT ET AL. *v.* YALE-NEW HAVEN HOSPITAL

Superior Court, Judicial District of New Haven
File No. CV-06-5005021-S

Memorandum filed September 30, 2008

*Jacobs & Jacobs, P.C.*, for the plaintiffs.

*Wiggin & Dana, LLP*, for the defendant.

BELLIS, J. The question presented by the motion to strike filed by the defendant, Yale-New Haven Hospital, is one of first impression. Essentially, the issue is whether the facts alleged by the plaintiffs, Carolyn Witt and Thomas Witt, which detail their lost opportunity to potentially conceive a child together, support claims of either negligent or intentional infliction of emotional distress. More specifically, the plaintiffs allege that the Yale Fertility Center at the defendant hospital discarded Carolyn Witt's ovarian tissue, which had been cryogenically frozen and stored for the purpose of using the tissue to allow the Witts to conceive a child in the future. In view of this alleged conduct, the plaintiffs plead negligent infliction of emotional distress as to Carolyn Witt in count one; intentional infliction of emotional distress as to Carolyn Witt in count two; negligent infliction of emotional distress as to Thomas Witt in

count three; and intentional infliction of emotional distress as to Thomas Witt in count four. For the reasons more fully set forth, the court denies the defendant's motion to strike as to counts one, two and three, as the emotional harms alleged by the plaintiffs were sufficiently foreseeable, the defendant's destruction of the plaintiffs' only opportunity to conceive a child together was outrageous and the defendant owed a duty of care to both parents seeking alternative reproductive technology (ART). The court, however, grants the defendant's motion to strike count four because Thomas Witt has not sufficiently supported his claim of intentional infliction of emotional distress with the requisite factual allegations.

I

FACTS

The operative complaint alleges the following facts. In 1997, Carolyn Witt was diagnosed with breast cancer, which was to be treated with chemotherapy. Because infertility was a likely side effect of the chemotherapy, the plaintiffs, who are married with no children, were referred to the Yale Fertility Center. On the recommendation of the defendant, and anticipating medical advances that would make a future pregnancy possible, the Witts agreed to allow the defendant to remove ovarian tissue from Carolyn Witt and to store it in the defendant's cryopreservation facility in December, 1997.

In May, 2004, the Witts became aware of a woman in New York who had given birth to a child after having had her ovarian tissue removed and frozen. Upon learning of this woman's successful pregnancy, the plaintiffs contacted the defendant to discuss the procedure for using Carolyn Witt's frozen ovarian tissue to conceive a child. On June 16, 2004, the plaintiffs next spoke with an employee of the defendant, who told them that Carolyn Witt's ovarian tissue had been discarded. The

import of this news had a devastating effect on the plaintiffs' respective emotional states, as, according to the revised amended complaint, Carolyn Witt suffered sleep disturbances, nightmares, headaches, inability to concentrate, depression, post-traumatic stress disorder, severe and extreme emotional distress, a diminished capacity or loss to engage in and enjoy many of life's activities, and Thomas Witt suffered severe and extreme emotional distress.

This action was subsequently commenced by summons served on the defendant on June 19, 2006, and the complaint was last revised on December 24, 2007. The defendant filed its motion to strike on March 6, 2008, which was supported by a memorandum of law. The plaintiffs were granted an extension of time to reply and filed their objection on June 5, 2008, which was also supported by a memorandum of law. During argument at short calendar on June 10, 2008, the court offered the parties an opportunity to submit additional briefs due to the novelty of the issues presented and the corresponding dearth of relevant case law; both parties filed supplemental briefs on July 10, 2008.

## II

### DISCUSSION

Before addressing the merits of the defendant's motion, the court sets forth the applicable standard of review.[1] "A motion to strike challenges the legal

[1] The court notes as a threshold matter that this is an ordinary negligence case and does not sound in medical malpractice. "[T]he relevant considerations in determining whether a claim sounds in medical malpractice are whether (1) the defendants are sued in their capacities as medical professionals, (2) the alleged negligence is of a specialized medical nature that arises out of the medical professional-patient relationship, and (3) the alleged negligence is substantially related to medical diagnosis or treatment and involved the exercise of medical judgment." (Internal quotation marks omitted.) *Dimmock* v. *Lawrence & Memorial Hospital, Inc.*, 286 Conn. 789, 812, 945 A.2d 955 (2008).

Additionally instructive is that courts have further explained that "[t]he rule of law that distinguishes between medical malpractice and ordinary

sufficiency of a pleading . . . and, consequently, requires no factual findings by the trial court." (Internal quotation marks omitted.) *Greco* v. *United Technologies Corp.*, 277 Conn. 337, 347, 890 A.2d 1269 (2006). "We take the facts to be those alleged in the complaint . . . and we construe the complaint in the manner most favorable to sustaining its legal sufficiency. . . . [I]f facts provable in the complaint would support a cause of action, the motion to strike must be denied. . . . Thus, we assume the truth of both the specific factual allegations and any facts fairly provable thereunder. In doing so, moreover, we read the allegations broadly . . . rather than narrowly." (Internal quotation marks omitted.) *Batte-Holmgren* v. *Commissioner of Public Health*, 281 Conn. 277, 294, 914 A.2d 996 (2007). Finally, although "all well-pleaded facts and those facts necessarily implied from the allegations are taken as admitted"; (internal quotation marks omitted) *Violano* v. *Fernandez*, 280 Conn. 310, 318, 907 A.2d 1188 (2006); "[a] motion to strike is properly granted if the complaint alleges mere conclusions of law that are unsupported by the facts alleged." (Internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC* v. *Alves*, 262 Conn. 480, 498, 815 A.2d 1188 (2003).

As noted previously, this is a case of first impression, and, consequently, there is a dearth of case law examining the issues raised by this particular fact pattern.

negligence requires a determination of whether the injury alleged occurred during treatment because of a negligent act or omission that was substantially related to treatment." *Trimel* v. *Lawrence & Memorial Hospital Rehabilitation Center*, 61 Conn. App. 353, 360, 764 A.2d 203, appeal dismissed, 258 Conn. 711, 784 A.2d 889 (2001).

In this case, it is alleged that the defendant discarded ovarian tissue that was supposed to remain cryogenically stored; no medical treatment or procedure was occurring at the time. Thus, although the defendant is sued in its capacity as a medical care provider, the alleged negligence at issue did not require professional judgment or the performance of any particular medical skill. Accordingly, because the claims in this case stem from the disposal of tissue that should not have been discarded—an act that is tantamount to poor record keeping and which does not require any medical

Thus, before assessing whether the requisite facts have been pleaded to support the alleged causes of action, the court is first obliged to resolve several questions of law that have not previously been considered by Connecticut courts. See *Gordon* v. *Bridgeport Housing Authority*, 208 Conn. 161, 170, 544 A.2d 1185 (1988) ("[n]otwithstanding the procedural posture of a motion to strike, this court has approved the practice of deciding the issue of governmental immunity as a matter of law"). Specifically, the court must resolve, as a matter of law, whether: (1) the emotional distress alleged by the plaintiffs was not sufficiently foreseeable to support claims of negligent or intentional infliction of emotional distress; (2) the defendant owed to Thomas Witt a duty of care necessary to sustain his negligent and intentional infliction of emotional distress claims; and (3) the disposal of ovarian tissue constitutes conduct that is so extreme and outrageous as to support a claim of intentional infliction of emotional distress.

## A

### Counts One and Three: Negligent Infliction of Emotional Distress

Mindful of these legal considerations, the court now considers in turn whether Carolyn Witt and Thomas Witt have respectively pleaded the facts necessary to support a claim of negligent infliction of emotional distress. In connection with these two counts, the defendant argues that the plaintiffs cannot make out negligent infliction of emotional distress claims because the emotional injury alleged was not foreseeable. In this respect, the defendant argues that because the plaintiffs knew that there was only a possibility that technology would develop enough to offer the potential to conceive a child together, it was not foreseeable that losing that

---

expertise—the court concludes that the standards governing ordinary negligence apply.

possibility would cause emotional injury. Additionally, the defendant argues that the cases relied on by the plaintiffs to support a holding that such injury is foreseeable are not relevant because they involve the loss of fertilized eggs rather than ovarian tissue alone. The defendant's final argument is limited to Thomas Witt's claim of negligent infliction of emotional distress: the defendant posits that it does not owe a duty of care to Thomas Witt because he was not a patient and has not pleaded the facts necessary to support a claim of bystander negligent infliction of emotional distress.

The plaintiffs argue that the emotional injury alleged was foreseeable because the defendant created and fostered the very hope that it dashed by discarding Carolyn Witt's ovarian tissue. Moreover, the plaintiffs contend that the case law they offer to support their foreseeability argument is directly on point, as those cases involve the same lost opportunity to conceive a child that is at issue in this case. Finally, the plaintiffs argue that the court should recognize a duty of care owed to Thomas Witt by the defendant due to the unique emotional investment that both parents commonly make in ART procedures. In view of these arguments, the court now turns to the guideposts informing negligent infliction of emotional distress claims and their foreseeability requirement.

In *Montinieri* v. *Southern New England Telephone Co.*, 175 Conn. 337, 345, 398 A.2d 1180 (1978), our Supreme Court recognized for the first time that "recovery for unintentionally-caused emotional distress does not depend on proof of either an ensuing physical injury or a risk of harm from physical impact." Instead, the court concluded that in such cases, "the defendant would not be liable unless the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm."

Id. Thus, a claim of negligent infliction of emotional distress requires a plaintiff to allege facts supporting the following elements: "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." *Carrol* v. *Allstate Ins. Co.*, 262 Conn. 433, 444, 815 A.2d 119 (2003).

In considering these elements, it bears emphasis that the primary focus for a court is on the question of foreseeability and not on the physical manifestation of the emotional injury. See *Perodeau* v. *Hartford*, 259 Conn. 729, 754, 792 A.2d 752 (2002) ("[i]n negligent infliction of emotional distress claims, unlike general negligence claims, the foreseeability of the precise nature of the harm to be anticipated [is] a prerequisite to recovery even where a breach of duty might otherwise be found" [internal quotation marks omitted]).[2] This rule is borne out of the concern that "the etiology of emotional disturbance is usually not as readily apparent as that of a broken bone following an automobile

---

[2] In this respect, it is also noteworthy that Connecticut law distinguishes general negligence claims that result in a derivative emotional injury caused by witnessing or receiving a physical injury on the one hand from negligent infliction of emotional distress, which does not require proof of either an ensuing physical injury or a risk of harm from physical impact, on the other. Compare *Bushnell* v. *Bushnell*, 103 Conn. 583, 594, 131 A. 432 (1925) (upholding jury charge that "[m]ental suffering . . . is also as proper an element of damage as physical suffering when it is a natural and proximate consequence of the physical injury"); with *Perodeau* v. *Hartford*, supra, 259 Conn. 749 (only foreseeable risk of ensuing physical harm required in negligent infliction of emotional distress claim).

As will be further discussed, this distinction is important not only in terms of properly assessing the elements to be pleaded, but also because ART cases from other jurisdictions that are seemingly analogous to the improper disposal of ovarian tissue at issue here shed their persuasive value due to requirements in those jurisdictions of an accompanying physical injury.

accident [and] that recognition of a cause of action for such an injury when not related to any physical trauma may inundate judicial resources with a flood of relatively trivial claims, many of which may be imagined or falsified, and that liability may be imposed for highly remote consequences of a negligent act." (Internal quotation marks omitted.) *Scanlon* v. *Connecticut Light & Power Co.*, 258 Conn. 436, 447 n.15, 782 A.2d 87 (2001). Accordingly, the foreseeability test encapsulated in the *Montinieri* test essentially requires "that the fear or distress experienced by the plaintiffs be reasonable in light of the conduct of the defendants. . . . [I]f the fear were unreasonable in light of the defendants' conduct, the defendants would not have recognized that their conduct could cause this distress and, therefore, they would not be liable." *Barrett* v. *Danbury Hospital*, 232 Conn. 242, 261–62, 654 A.2d 748 (1995).

In this case, the plaintiffs allege that the defendant was providing reproductive technology services to them with the full knowledge that the frozen ovarian tissue it had harvested and stored was their only hope of one day conceiving a child together. Although the plaintiffs acknowledge that their chances of a future pregnancy depended on the development of anticipated new technologies, they nevertheless claim that they experienced severe emotional distress as a result of the anxiety created by the lost opportunity to ever utilize such technology in the future. Thus, as a threshold matter, the court must now resolve the question as to whether the anxiety or fear attendant upon the loss of an opportunity to use anticipated future technology to potentially conceive a child is sufficiently foreseeable to support a claim of negligent infliction of emotional distress.

Not only has this issue not yet been decided by a Connecticut court, but there is little case law nationwide to provide meaningful guidance. Those courts that

have evaluated claims in analogous situations have held that the emotional harm attending the deprivation of the "opportunity of experiencing pregnancy, prenatal bonding, and the birth of a child" is foreseeable. See, e.g., *Perry-Rogers* v. *Obasaju*, 282 App. Div. 2d 231, 231–32, 723 N.Y.S.2d 28 (inadvertently implanting embryo into wrong patient was foreseeable emotional harm due to lost opportunity of experiencing pregnancy), leave to appeal dismissed, 96 N.Y.2d 936, 759 N.E.2d 374, 733 N.Y.S.2d 375, 97 N.Y.2d 638, 760 N.E.2d 1290, 735 N.Y.S.2d 494 (2001); *Del Zio* v. *The Presbyterian Hospital*, Docket No. 74 Civ. 3588, 1978 U.S. Dist. LEXIS 14450, *14 (S.D.N.Y. November 14, 1978) (Stewart, J.) (discarding only embryos hospital could harvest from mother, and, consequently, dashing all hope of future pregnancy "predictably caused severe emotional distress," even though ART procedure being used was highly experimental). Although the present case did not involve the in vitro fertilization procedure, these cases are nevertheless analogous because they involve the same lost opportunity to potentially conceive a child together or to experience a pregnancy that the plaintiffs in this case argue is the root cause of their respective emotional injuries.

These cases are also significant because New York, like Connecticut, does not require a physical injury as an element for negligent infliction of emotional distress, which other jurisdictions do. Compare *Montinieri* v. *Southern New England Telephone Co.*, supra, 175 Conn. 345 ("recovery for unintentionally-caused emotional distress does not depend on proof of either an ensuing physical injury or a risk of harm from physical impact"); *Perry-Rogers* v. *Obasaju*, supra, 282 App. Div. 2d 231, 231 ("[d]amages for emotional harm can be recovered even in the absence of physical injury"); with *Frisina* v. *Women & Infants Hospital of Rhode Island*, Docket Nos. 95-4037, 95-4469, 95-5827, 2002 R.I. Super. LEXIS

73, *11-*12 (R.I. Super., Providence, May 30, 2002) (Gibney, J.) (plaintiff must suffer physical symptomatology to recover damages for negligent infliction of emotional distress); *York* v. *Jones*, 717 F. Sup. 421, 423 n.2, 424 (E.D. Va. 1989) (bodily harm required for emotional distress claim arising out of clinic's refusal to release couple's pre-embryos from one facility to another). Thus, in those jurisdictions that do not require physical injury to support a claim of negligent infliction of emotional distress, there is persuasive support for the proposition that the anxiety created by the foreclosure of an opportunity to potentially conceive a child is foreseeable.

Moreover, the legal academy has also documented the significant emotional stress that routinely accompanies ART procedures, further buttressing the viewpoint that reasonable health care professionals are aware of the heightened potential for emotional distress that negligence can cause in these cases. See, e.g., T. Feliciano, "*Davis* v. *Davis*: What about Future Disputes?" 26 Conn. L. Rev. 305, 308–309 (1993) (ART experience "emotionally draining for both prospective parents. Clinics report that couples attempting [in vitro fertilization] often show an abnormal attachment to the embryos, sometimes even naming them, and experience deep depression if successful implantation does not occur"); I. Heide, "Negligence in the Creation of Healthy Babies: Negligent Infliction of Emotional Distress in Cases of Alternative Reproductive Technology Malpractice Without Physical Injury," 9 J. Med. & L. 55, 70–72 (2005) (noting that because "[t]he ART treatment process makes patients very vulnerable, in many ways more so than patients of traditional medical interventions . . . many doctors have begun to include mental health counseling and personnel as part of the regular services provided to ART patients"). Thus, these articles further support the position that it was reasonable for

the defendant in this case to appreciate that the plaintiffs' lost opportunity to use developing technologies to conceive a child together could reasonably result in severe emotional distress.

The plaintiffs' very actions, as pleaded in their complaint, also manifest a clear emotional investment in the procedures recommended to them by the defendant, which would be reasonably apparent to any ART provider. Indeed, in view of the Witts' decision in this case to bear the emotional, physical and financial expense of harvesting and freezing the ovarian tissue—a decision based on the defendant's very own recommendation—it should have been reasonably apparent to the defendant that the plaintiffs harbored a significant emotional investment in the potential for a future pregnancy. Moreover, the scholarly articles from the legal academy referenced previously further suggest that an ART practitioner would reasonably be aware of both the heightened emotional distress that commonly attends these procedures and the special attachment that parents typically maintain for this type of unique genetic material.[3]

[3] In its supplemental brief, the defendant draws a distinction between an embryo and ovarian tissue, arguing that "the wrongful disposal of pre-embryos is of a fundamentally different nature and magnitude than the foreseeability of emotional distress arising from the disposal of ovarian tissue that requires 'medical advances' in order to 'make pregnancy a possibility.'" Unlike ovarian tissue, embryos are commonly defined as fertilized eggs resulting from insemination. See, e.g., J. Robertson, "In the Beginning: The Legal Status of Early Embryos," 76 Va. L. Rev. 437, 441–43 (1990) (discussing biological status of early embryos); see also *Kass* v. *Kass*, 91 N.Y.2d 554, 557, 696 N.E.2d 174, 673 N.Y.S.2d 350 (1998) (noting biological aspects of human development for purposes of evaluating competing legal rights of parents as to their frozen embryos).

Although this argument merits attention, after careful consideration, the court concludes that it is misplaced in this context. The question here is not what legal rights ovarian tissue, embryos, previability fetuses or postviability fetuses enjoy in their own right, but rather what type of emotional injury is foreseeable for parents to incur as a result of the defendant's discarding the ovarian tissue, reproductive material which, according to the complaint, resulted in the Witts losing the potential to conceive a child together at some point in the future.

See, e.g., T. Feliciano, supra, 26 Conn. L. Rev. 308–309; I. Heide, supra, 9 J. Med. & L. 70–72.

It is additionally noteworthy that the plaintiffs' hope in this case that medical technology would eventually develop to support a realistic chance for future pregnancy was also reasonable. Indeed, the Witts' hope was created by the defendant, which, "anticipating medical advances," recommended that the plaintiffs harvest and freeze Carolyn Witt's ovarian tissue in this first instance. It is logical to infer, after all, that the defendant would not recommend an invasive procedure, such as harvesting ovarian tissue, if there was not a reasonable likelihood that such a procedure might well serve as the first step in conceiving a child.[4] As noted by the court in *Del Zio*, "if the experiment indisputably and demonstrably had no chance of success and this was known and understood by the plaintiffs, it would seem that

And in this respect, *Del Zio* v. *The Presbyterian Hospital*, supra, 1978 U.S. Dist. LEXIS 14450, is particularly analogous. Indeed, in that case, too, the attempted ART procedure was still highly experimental and had not yet been successfully accomplished in humans. Yet, the parents' emotional injury in that case was held to be foreseeable both because the hospital had recommended the procedure to the parents and because the parents' hope in the recommended technology was subsequently vindicated by another couple's successful use of that precise technology to achieve pregnancy.

These same two factual predicates are also present in this case, and these considerations are equally compelling in determining the foreseeability issue before this court. The court, therefore, concludes that ART cases involving the lost opportunity to ever potentially conceive a child are analogous to the facts of this case and are particularly so when they involve developing technologies. Accordingly, the court views these cases as persuasive.

[4] The defendant argues that it is not reasonably foreseeable for it to have comprehended the emotional distress that could result from its discarding the plaintiff's ovarian tissue, as no pregnancy could be guaranteed in the first place. This argument, however, confuses the loss of a pregnancy itself with the loss of an opportunity to potentially become pregnant, and thereby experience pregnancy, prenatal bonding and the birth of a child. As in *Perry-Rogers* and in *Del Zio*, it is the loss of the opportunity potentially to become pregnant rather than the loss of an actual fetus that caused the emotional distress.

the plaintiffs might not be entitled to recover." *Del Zio* v. *The Presbyterian Hospital*, supra, 1978 U.S. Dist. LEXIS 14450, \*14. The court agrees with this reasoning. There are no allegations in the complaint that suggest that the defendant was recommending an experimental procedure with little or no chance of success; instead, the allegations are that the recommendation of the defendant to remove, freeze and store the ovarian tissue was in anticipation of medical advances that would allow a pregnancy—advances which, according to the complaint, came to fruition less than six and one-half years later when a New York woman gave birth after having had her ovarian tissue removed and frozen. The court rejects the defendant's argument that it was unreasonable for the plaintiffs to expect to use the ovarian tissue successfully, given the allegations of the complaint.

The court believes it was reasonable for the defendant to appreciate that the level of fear or anxiety created by the loss of the only opportunity to potentially conceive a child with one's spouse could likely result in emotional distress severe enough that it might result in illness or bodily harm. Regardless of the likelihood of success, the lost opportunity to even attempt utilization of anticipated technologies at all can lead to understandable fear or anxiety, which is especially so in this case in which the recommendation and plan—indeed, the hope—was created by the defendant, and the consequence of the defendant's alleged action is to foreclose the potential for the plaintiffs to ever conceive a child together. Accordingly, the court concludes that it was reasonably foreseeable for the defendant to appreciate that its discarding the ovarian tissue could result in the type of overwhelming anxiety sufficient to cause illness or bodily harm.

In view of the foregoing, the court concludes that Carolyn Witt has pleaded facts sufficient to state a claim

of negligent infliction of emotional distress in count one of the plaintiffs' complaint. The defendant created an unreasonable risk of causing emotional distress when it foreclosed the plaintiffs' only opportunity to potentially conceive a child together by discarding Carolyn Witt's ovarian tissue. This risk was foreseeable both because the defendant created the hope that the successful harvesting and freezing of ovarian tissue could one day allow for a pregnancy to occur and because it is reasonable for ART practitioners to be aware of the heightened emotional stress that ART patients are under. Indeed, the anxiety the plaintiffs experienced as a result of the lost ovarian tissue was so predictably severe that the defendant should have known that it could reasonably lead to illness or physical injury. Finally, the plaintiffs have alleged that the defendant's conduct caused this anxiety, and, in the case of Carolyn Witt, that anxiety led to the physical manifestations of emotional illness, including sleep disturbances, nightmares, headaches, inability to concentrate and depression. Consequently, the court denies the defendant's motion to strike count one of the plaintiffs' complaint, alleging negligent infliction of emotional distress against Carolyn Witt.

The court next turns to count three, which claims negligent infliction of emotional distress on behalf of Thomas Witt. Before considering whether the necessary facts have been alleged, however, the court must first decide whether the defendant owed a duty of care to Thomas Witt such that he is capable of maintaining his claim of negligent infliction of emotional distress. "The existence of a duty is a question of law and [o]nly if such a duty is found to exist does the trier of fact then determine whether the defendant violated that duty in the particular situation at hand." (Internal quotation marks omitted.) *RK Constructors, Inc.* v. *Fusco Corp.*, 231 Conn. 381, 384, 650 A.2d 153 (1994). Moreover,

our Supreme Court has stated that "the test for the existence of a legal duty of care entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case." (Internal quotation marks omitted.) *Zamstein* v. *Marvasti*, 240 Conn. 549, 558, 692 A.2d 781 (1997). Thus, in deciding the question of whether the defendant owed to Thomas Witt a duty of care for the storage of his wife's ovarian tissue in the context of ART, the court must first address the question of foreseeability and then inquire whether public policy supports recognition of such a duty.

Having already decided that it was reasonably foreseeable for the defendant to appreciate that the loss of ovarian tissue could result in the type of overwhelming anxiety sufficient to cause illness or bodily harm,[5] the court now turns its attention to the relevant public policy considerations implicated in this case as it relates

[5] It is noted that the type of severe anxiety that the court found likely to result in illness or physical injury in the case of Carolyn Witt is equally likely in the case of Thomas Witt. Indeed, the emotional distress claims sustained in *Del Zio* were advanced by both parents. Moreover, as discussed previously, the ART experience is "emotionally draining for both prospective parents." T. Feliciano, supra, 26 Conn. L. Rev. 308. That both potential parents who are desirous of conceiving a child together predictably suffer severe anxiety capable of resulting in injury is not surprising, given the unique nature of the experience.

And while the ovarian tissue in this case had not yet been fertilized by Thomas Witt, the loss of that tissue has prevented him from conceiving a child with his wife as much as if the defendant had discarded the plaintiffs' embryos. Consequently, the court concludes that the defendant's conduct in eliminating any chance that Thomas Witt had in conceiving a child with his wife was as likely to foreseeably result in Thomas Witt's emotional distress as in the case of Carolyn Witt for the reasons discussed previously.

to Thomas Witt. Our Supreme Court has previously articulated "four factors to be considered in determining the extent of a legal duty as a matter of policy: (1) the normal expectations of the participants in the activity under review; (2) the public policy of encouraging continued vigorous participation in the activity, while protecting the safety of the participants; (3) the avoidance of increased litigation; and (4) the decisions of other jurisdictions." *Perodeau* v. *Hartford,* supra, 259 Conn. 756–57; accord *Jaworski* v. *Kiernan,* 241 Conn. 399, 407, 696 A.2d 332 (1997).

Turning to the first guidepost, the normal expectations of the participants in the activity under review, the court views the relationship between parents and ART practitioners to be analogous to the relationship shared by immediate family members and a mortician. In both cases, there is an important dignity interest shared by families: caring for human remains in a respectful manner in the case of a relative's corpse and preserving the potential for human reproduction in the case of a spouse's ovarian tissue.[6] Moreover, the relationship that a mortician has with the immediate family members of the decedent is akin to the relationship that a fertility physician has with both parents: both relationships involve a class of related people who are particularly vulnerable emotionally and are heavily dependent on the practitioner's diligence. Most importantly, though, in both situations the practitioner's duty to the immediate family is predicated on the family's

---

[6] By way of example, just as "[t]here is a cognizable and compensable interest . . . in the comfort of knowing that the deceased has been given a comfortable and dignified resting place" (internal quotation marks omitted); *Del Core* v. *Mohican Historic Housing Associates,* 81 Conn. App. 120, 124, 837 A.2d 902 (2004); there is also a "special respect" accorded to human reproductive tissue, which "occupies a position on the emotional (and perhaps moral) spectrum far removed from that of ordinary tissue." (Internal quotation marks omitted.) *Janicki* v. *Hospital of St. Raphael,* 46 Conn. Sup. 204, 218–19, 744 A.2d 963 (1999).

shared reliance on the practitioner's professional performance to ensure the desired result. Just as a mother and father would be equally distressed to learn that their deceased child was cremated despite their instructions to the mortician to embalm the child for an open casket wake, so, too, would the same parents be equally distressed to learn that their only hope for having a child together was discarded by their medical provider.

It is therefore significant that in Connecticut, morticians appear to owe a duty of care to the immediate family members of a decedent. See *Del Core* v. *Mohican Historic Housing Associates*, 81 Conn. App. 120, 124–25, 837 A.2d 902 (2004) ("Connecticut should recognize a claim for negligent interference with the right of a family member to control the proper burial of a deceased"). Moreover, in *Perkins* v. *Colonial Cemeteries, Inc.*, Superior Court, judicial district of Stamford-Norwalk, Docket No. CV-95-144646 (May 16, 1996) (*Karazin, J.*), by way of illustration, the defendant, on different occasions, indicated that the body of the plaintiff's daughter was in three different grave sites, thereby requiring the plaintiff to exhume her daughter's body to confirm the actual grave site of her remains. The court denied the defendant's motion to strike the plaintiff's intentional infliction of emotional distress claim, implicitly acknowledging that the defendant had violated its duty of care to the plaintiff. In another case, *Begin* v. *Driscoll Mortuary*, Superior Court, judicial district of Litchfield, Docket No. 0050103 (April 25, 1990) (*Pickett, J.*) (1 Conn. L. Rptr. 549), the court adjudicated a count that alleged that the defendant failed to repair and preserve the body of the decedent in a "workmanlike manner." The *Begin* court stated that "it is conceivable that the mortuary's failure to prepare the body for a proper burial could pose an unreasonable risk of emotional distress to the decedent's family." Id., 550. Moreover, in *Himberg* v. *Shure*

*Funeral Home,* Superior Court, judicial district of New Haven, Docket No. CV-99-0266920 (February 20, 2001) (*A. Robinson, J.*) (29 Conn. L. Rptr. 201), the court held there to be a duty "owed by funeral homes or mortuaries to the relatives of a decedent . . . ."[7] It is noteworthy that in these cases, the duty owed was to the direct family members of the decedent and not to the decedent's estate alone.

Accordingly, the court concludes that the parties in this case entered into a similar relationship—one predicated on the special relationship forged between a professional and emotionally vulnerable clients who rely on the practitioner's care to navigate emotionally charged human experiences. In such a relationship, both parties reasonably expect that the practitioner will exercise care in mitigating the potential for conduct that would foreseeably result in an even greater emotional injury than the circumstances that brought them to the practitioner's office in the first place. To this end, it would be reasonable for the aspiring parents to be notified of developments impacting their reproductive tissue and to be consulted before their ART provider took affirmative steps affecting the potential for the couple to conceive a child together in the future.[8] Thus, the court

[7] A majority of other jurisdictions to consider this issue have likewise held that a mortician owes a duty of care to the immediate family members of a decedent. See, e.g., *Nagle* v. *Riverview Cemetery Co.,* 1989 WL 16983 (Del. Super., New Castle County, February 15, 1989) (Babiarz, J.); *Dufour* v. *Westlawn Cemeteries, Inc.,* 639 So. 2d 843 (La. App. 1994); *Carney* v. *Knollwood Cemetery Assn.,* 33 Ohio App. 3d 31, 514 N.E.2d 430 (1986); *Scarpaci* v. *Milwaukee County,* 96 Wis. 2d 663, 672, 292 N.W.2d 816 (1980); see also W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 54, p. 362; H. Bigelow, "Damages: Pleading: Property: Who may recover for wrongful disturbance of a dead body," 19 Cornell L.Q. 108, 110–11 (1933).

[8] This court, of course, is adjudicating only the specific claims alleged in this case, and this is not intended to be an exclusive enumeration of the duties that an ART practitioner owes to the parent-patient it counsels and treats. Obviously, the contours of the duty owed will be more fully defined as different cases with different facts and allegations are adjudicated.

It is sufficient for the purposes of this case, however, to note that the duty of care owed by an ART practitioner to its parent-patients is broadly

concludes that the first inquiry of the duty guideposts is satisfied.

In connection with the public policy considerations of encouraging continued vigorous participation in the activity, while contemporaneously protecting the safety of the participants, the court believes that recognition of an ART practitioner's duty to both participating parents strikes the appropriate balance. As will be further explained, because there is a limited number of potential litigants, i.e., the parents seeking ART treatment, it is unlikely that recognition of this duty will significantly increase litigation in this area or increase the potential for double recovery. At the same time, ensuring that ART practitioners are accountable to the couples they assist for the emotional injury that would foreseeably result from their negligence is likely to ensure greater diligence and further increase patients' confidence in their ART provider. Greater practitioner accountability, coupled with increased patient confidence, is likely to help ensure robust participation in ART clinics. Thus, recognition of this duty raises little fear that such a duty will "impose an added economic burden upon society"; (internal quotation marks omitted) *Mendillo* v. *Board of Education*, 246 Conn. 456, 487, 717 A.2d 1177 (1998); while at the same time increasing society's utilization of these vital services going forward.

Moreover, in reflecting on the second and third guideposts of this duty analysis, the court notes the dual benefits realized by ensuring that the actual victims of ART negligence or recklessness are compensated for

---

analogous to the duty a mortician owes to the immediate family members of a deceased. At a minimum, this includes mitigating the potential for conduct that would foreseeably result in an even greater emotional injury than the circumstances that brought them to the practitioner's office in the first place by notifying or consulting with the parent-patients of developments or decisions that affect their ability to conceive a child together.

their injuries. Limiting the duty owed by an ART provider to its parent-patients alone both increases patient confidence in the services provided due to the deterrent effect civil litigation has on ART providers (second guidepost) and decreases the potential for increased litigation by simultaneously adhering to the important constraints that limit bystander negligent infliction of emotional distress claims (third guidepost). It therefore bears emphasis that recognition of a duty by ART practitioners to both parent-patients helps to ensure that the actual victims of ART negligence or recklessness are compensated properly for their injury. Unlike the primary victim of a motor vehicle accident or the victim of medical malpractice, neither ovarian tissue nor an embryo is a person with legal rights that can be enforced in court. Indeed, in cases in which an ART practitioner engages in negligent or reckless conduct, the tissue or embryo is not the primary victim at all. The victims are the parents who have been deprived of the potential to conceive a child together. Ergo, holding ART practitioners accountable for their ordinary negligence that results in an emotional injury to the parents, rather than solely holding them accountable for their medical malpractice during an invasive medical procedure, provides a meaningful way to ensure both robust participation in ART clinics and simultaneously to ensure appropriate levels of accountability to protect the emotional safety of the parents. Consequently, the duty at issue here advances the public policy of improving ART care and providing a remedy for the parties most directly injured by an ART provider's negligence without increasing the societal costs associated with the litigation costs that attend untethered liability.

Turning to the third factor, ensuring that such a duty does not overly increase the potential for litigation, the court is satisfied that the potential is remote because the pool of potential litigants is inherently limited. It is

noted at the outset that this cause of action is usefully distinguished from claims involving secondary victims of negligence. The aspiring parents are the primary victims in a case such as this, and the defendant's reliance on third party liability precedent is, therefore, misplaced. Moreover, this situation also stands in contradistinction to cases in which a defendant's liability is extended to a potentially unlimited number of third parties because there is a natural boundary of just two claims arising out of a tortious ART transaction, which is not true in most third party liability cases.[9] For this reason, the concerns regarding the restrictions placed on recovery in the bystander line of cases are not relevant both because this case does not involve a secondary victim and because there is a limited universe of potential claimants.

In this respect, *Janicki* v. *Hospital of St. Raphael*, 46 Conn. Sup. 204, 226–27, 744 A.2d 963 (1999), is instructive. In that case, Judge Blue considered whether the mother of a stillborn fetus had a cognizable claim of negligent infliction of emotional distress against a hospital for dissecting her fetus against her express instructions. Holding that the mother was not a secondary victim because the fetus was not yet a person with legally enforceable rights, Judge Blue decided that the mother was a direct victim to whom the hospital owed a duty of care. Id. In this case, too, the ovarian tissue at issue is not a person with legal rights, and it is the

---

[9] In this respect, the duty owed by an ART practitioner to both participating parents is limited in the same manner as a spousal consortium claim. See *Mendillo* v. *Board of Education*, supra, 246 Conn. 487 (spousal consortium claim has natural boundary of just one claimant). Obviously, though, the duty owed directly to both parents involved in an ART procedure is not a derivative claim stemming from the injury done to another human being, as is the case with spousal consortium claims. Instead, the duty breached in this case is one owed directly to the parents by the defendant to refrain from conduct that could foreseeably cause emotional distress severe enough to result in illness or bodily harm.

Witts who suffer the emotional distress attending their lost potential to conceive a child together. Accordingly, because the very nature of human reproduction innately limits the field of potential claimants, the control mechanisms discussed in *Clohessy* v. *Bachelor*, 237 Conn. 31, 52–56, 675 A.2d 852 (1996), for recovery for emotional distress as a result of harm done to a third party are unnecessary.

The court next inquires whether the cases of other jurisdictions recognize a duty owed by an ART practitioner to both parents engaging their services. Although no jurisdiction has previously resolved this issue directly, New York has previously held that both parents advanced cognizable emotional distress claims. See, e.g., *Del Zio* v. *The Presbyterian Hospital*, supra, 1978 U.S. Dist. LEXIS 14450, *5, *11 (court allowed claims by both parents of intentional infliction of emotional distress to go to jury for deliberation). Indeed, the *Del Zio* court noted that even though the defendants in that case did not know the precise identity of the parents, they knew or should have known that a man and a woman were involved and that both parents would likely suffer severe emotional distress from the decision to end the experimental procedure that could have resulted in pregnancy. Id., *13-*14.

The only other cases seemingly on point are less helpful for a variety of reasons. Illustratively, the claims asserted in *Perry-Rogers* v. *Obasaju*, supra, 282 App. Div. 2d 231, appear to have been brought by the mother alone, thus obviating the need for that court to examine the ART provider's duty to the father. Similarly, the court in *Frisina* v. *Women & Infants Hospital of Rhode Island*, supra, 2002 R.I. Super. LEXIS 73, *30, granted the defendant's motion for summary judgment as to the plaintiffs' negligent infliction of emotional distress claim due to the lack of physical injury and read the

plaintiffs' next emotional distress claim as being emotional distress due to the loss of irreplaceable property rather than for the loss of the possibility of achieving pregnancy. Id., *30-*32. Although that case involved the loss of a couple's pre-embryos by a hospital, it is of little relevance here because Connecticut law does not require physical injury to be manifested as an element of negligent infliction of emotional distress and because it did not address the duty that an ART provider owes to each participating parent for the loss of potentially conceiving a child. In the same vein, an Arizona court's examination of emotional distress caused by the loss of a couple's pre-embryos also considered that claim in the context of emotional distress arising from the negligent destruction of property rather than as a negligent infliction of emotional distress claim. See *Jeter* v. *Mayo Clinic Arizona*, 211 Ariz. 386, 401–403, 121 P.3d 1256 (App. 2005).[10] Accordingly, the court concludes that of the limited number of cases to address issues similar to those confronted in this case, there is support in other jurisdictions for recognizing a duty owed by an ART practitioner to both parents.

In view of this analysis, the court concludes that the defendant in this case owed a duty of care directly to Thomas Witt because recognition of that duty conforms

---

[10] It is noted that *Jeter* v. *Mayo Clinic Arizona*, supra, 211 Ariz. 401–402, briefly addressed a similar argument that analogized a cause of action for interference with dead bodies to a cause of action for interference with pre-embryos. The court observes, however, that that analogy did not center on the duty a mortician or ART provider owed to family members but instead inquired whether an entirely new cause of action predicated on quasi-property rights should be recognized.

In this case, the court does not purport to recognize a new cause of action but instead looks to the duty a mortician owes to the family members of a decedent to inform its understanding of whether a similar duty is owed in the context of an emotional distress claim by an ART practitioner to a couple seeking fertility treatment. Moreover, that court did not examine the duty issue at all. Accordingly, the court does not find this case to be persuasive with respect to the nature of the duty presented here.

to the parties' expectations, encourages future utilization of ART procedures by society without being likely to result in increased litigation or other societal costs and enjoys support from other jurisdictions to have considered this issue.

Consequently, the court denies the defendant's motion to strike count three, alleging negligent infliction of emotional distress against Thomas Witt, as the allegations contained in the operative complaint give rise to a duty owed by the defendant to Thomas Witt. Moreover, for the reasons further elucidated previously, it was foreseeable that the defendant's conduct in this regard would result in the type of severe anxiety that could result in physical injury or illness, and Thomas Witt alleges that this conduct was the cause of that anxiety. Thomas Witt has, therefore, alleged the elements necessary to set forth a claim of negligent infliction of emotional distress.

## B

### Counts Two and Four: Intentional Infliction of Emotional Distress

The court next addresses the defendant's motion to strike count two, claiming intentional infliction of emotional distress by Carolyn Witt, and count four, claiming intentional infliction of emotional distress by Thomas Witt. In claims for intentional infliction of emotional distress, a plaintiff must establish four elements. "It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe. . . . Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is

initially a question for the court to determine." (Citation omitted; internal quotation marks omitted.) *Appleton* v. *Board of Education*, 254 Conn. 205, 210, 757 A.2d 1059 (2000).

In this case, the plaintiffs allege that the defendant knew or should have known that its having unilaterally discarded Carolyn Witt's ovarian tissue was likely to cause the plaintiffs severe emotional distress, including destroying any hope they had of potentially conceiving a child together. For the reasons articulated in part II A, the court concludes that as a matter of law, the defendant's conduct was foreseeable, and that, consequently, the defendant should have known that emotional distress was indeed the likely result of its actions. Accordingly, the plaintiffs have satisfied the first criterion for a claim for intentional infliction of emotional distress, namely, that the actor intended to inflict emotional distress or that it knew or should have known that emotional distress was the likely result of its conduct. See id.

The second criterion requires the court to decide whether the conduct was extreme and outrageous. Our case law teaches that liability exists "where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' . . . Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." (Citation omitted; internal quotation marks omitted.) Id., 211. Accordingly, the dispositive question is whether the defendant's unilateral decision to discard Carolyn

Witt's ovarian tissue, when the defendant recommended that it be harvested in the first instance, then frozen and stored, anticipating medical advances that would allow the Witts to use the tissue to conceive, is so extreme and outrageous as to exceed the bounds of decency.

Although no Connecticut case addresses this issue, the *Del Zio* court found that a jury could conclude that the disposal of pre-embryos, done without prior notice or an opportunity to consider other alternatives, could support the "kind of deliberate, shocking and reckless conduct" necessary to ground a claim for intentional infliction of emotional distress. *Del Zio* v. *The Presbyterian Hospital*, supra, 1978 U.S. Dist. LEXIS 14450, *13. As in *Del Zio*, the plaintiffs in this case, according to their complaint, have also lost their only opportunity to potentially conceive a child together. Additionally, the complaint alleges that the defendant also failed to notify the plaintiffs that Carolyn Witt's ovarian tissue had been discarded. This is a case in which the plaintiffs allege that a hospital unilaterally discarded unique genetic material that subsequent technology confirmed had the potential to be reimplanted in Carolyn Witt to provide the opportunity to have a child with her husband. The court concludes that this is so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community. Given the plaintiffs' allegations that the defendant, for the purpose of human reproduction and anticipating medical advances, recommended and implemented a plan under which it would remove, freeze and store Carolyn Witt's ovarian tissue in its cryopreservation facility, but then unilaterally discarded it without consulting or even notifying the Witts, the court is hard-pressed to imagine conduct that is any more outrageous and utterly intolerable in a society in which a couple's desire to procreate, thereby

leaving an indelible mark in our societal fabric, is so fundamental as to be inviolable. Consequently, the plaintiffs have satisfied the second criterion required to maintain a claim for intentional infliction of emotional distress.

Turning to the third criterion, whether the defendant's conduct was the cause of the plaintiffs' distress, the court concludes that this requirement, too, has been satisfied. Both plaintiffs pleaded that their emotional distress began after learning that Carolyn Witt's ovarian tissue had been discarded, which supports their assertion that the defendant's conduct was the cause of their emotional distress.

With respect to the fourth criterion, the court concludes that Carolyn Witt has alleged the facts necessary to support her claim that her emotional distress was severe, but that Thomas Witt has not. Although Carolyn Witt alleges that she suffered sleep disturbances, nightmares, headaches, inability to concentrate, depression and post-traumatic stress disorder, Thomas Witt makes only the conclusory statement that his emotional distress was severe and does not support that conclusion with similar facts. See *Fort Trumbull Conservancy, LLC* v. *Alves*, supra, 262 Conn. 498 ("[a] motion to strike is properly granted if the complaint alleges mere conclusions of law that are unsupported by the facts alleged" [internal quotation marks omitted]). Accordingly, the court denies the defendant's motion to strike count two of the plaintiffs' amended complaint and grants the defendant's motion to strike count four of the plaintiffs' amended complaint.

## III

## CONCLUSION

For the reasons set forth previously, the court denies the defendant's motion to strike as to count one (negligent infliction of emotional distress by Carolyn Witt),

count two (intentional infliction of emotional distress by Carolyn Witt), and count three (negligent infliction of emotional distress by Thomas Witt). The court, however, grants the defendant's motion to strike count four (intentional infliction of emotional distress by Thomas Witt).